IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 14, 2003 Session

## STATE OF TENNESSEE v. PAUL DENNIS REID, JR.

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 38887     John H. Gasaway, III, Judge**

---

**No. M2001-02753-CCA-R3-DD - Filed December 29, 2003**

---

The appellant, Paul Dennis Reid, Jr., was found guilty by a jury of two counts of premeditated murder, two counts of felony murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery. The felony murder convictions were merged into the premeditated murder convictions. Thereafter, the jury sentenced the appellant to death based upon the existence of three aggravating circumstances: the appellant had previously been convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; the murders were committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of defendant or another; and the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. The trial court sentenced the defendant as a violent offender to twenty-five years imprisonment for especially aggravated robbery and especially aggravated kidnapping, to run consecutively to his sentences for first degree murder and to a prior out-of-state sentence. On appeal, appellant presents forty-five issues. After an extensive review of the record and the applicable law, we find that none of these issues warrants a reversal of this case. Therefore, the judgments of the trial court are AFFIRMED.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

James A. Simmons and Thomas F. Bloom, Nashville, Tennessee for the appellant, Paul Dennis Reid, Jr.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

---

**Factual Background**

On April 23, 1997, twenty-one year-old Angela Holmes and sixteen-year-old Michelle Mace were abducted and murdered while working at the Baskin-Robbins ice cream store on Wilma Rudolph Boulevard in Clarksville, Tennessee. Both Ms. Holmes's and Ms. Mace's bodies were found the following morning at the Dunbar Cave State Park in Clarksville. Appellant was indicted for the kidnapping and murders of Ms. Holmes and Ms. Mace on June 25, 1997. Prior to the return of the indictments in this case, the appellant was charged with committing robbery and murder at a Captain D's restaurant and a McDonald's restaurant in Nashville. Appellant was convicted of the murders at the Captain D's restaurant and sentenced to death prior to the trial in this case. Appellant's convictions and death sentences for these murders have been affirmed by the Supreme Court. See State v. Reid, 91 S.W.3d 247 (Tenn. 2002).

**Competency Phase**

On September 3, 1999, eight days prior to trial, appellant filed a motion for the judicial determination of his competency to stand trial. In support of his motion, appellant filed the affidavit of his minister, Rev. Joe Ingle, and the opinions of psychologists Dr. Pamela Auble and Dr. Xavier Amador. The trial court held the competency hearing on September 8, 9 and 10, 1999. Dr. Pamela Auble and Dr. Xavier Amador testified on behalf of appellant. Appellant also sought to have Rev. Joe Ingle and social worker Mary Ann Hea testify. However, the trial court informed defense counsel that the testimony of those witnesses may violate the pastor-parishoner and attorney-client privileges. Thereafter, counsel for appellant withdrew these individuals as witnesses. Dr. William Bernet testified on behalf of the State, and Dr. Cynthia Turner-Graham testified as an independent psychiatrist.

Dr. Pamela Auble, a psychologist specializing in neuropsychology, first examined appellant in January 1998 as a result of the charges pending against him in the Captain D's murders. Since January 1998, Dr. Auble has examined the appellant on six occasions. In addition to her interviews of appellant, Dr. Auble has also interviewed appellant's mother and sister, reviewed appellant's medical records, school records, and prison records, and reviewed reports of interviews with appellant's family and friends.

According to Dr. Auble, appellant advised her in an interview in January 1999 that the federal government had been conducting surveillance on him for many years and attempted to control him. Appellant advised her that the government had "radiated" his body with some type of

magnetic[1] field and was able to then monitor him on a distant screen. In addition to monitoring him, appellant advised Dr. Auble the government had also attempted to control him. Appellant advised her that he had been under surveillance for thirteen years as a part of an experiment conducted by the CIA. Appellant further advised Dr. Auble that the surveillance program was actually developed by the Soviet Union. He concluded that no one from the government would come forward with the surveillance tapes of him because it may compromise national security. At the competency hearing, Dr. Auble testified that she saw letters appellant wrote to Texas officials in 1993 in which he espoused the same beliefs. When she questioned appellant about the letters, he responded that when he talks about the government surveillance, people think he is insane.

Dr. Auble testified that she actually became concerned about appellant's competency to stand trial during his trial for the Captain D's murders. On April 15, 1999, the day following his conviction of the Captain D's murders and the day prior to the commencement of the sentencing hearing, Dr. Auble interviewed appellant at the request of his counsel following appellant's decision not to present any mitigating proof at the sentencing hearing. Appellant advised her in that interview that there was no reason to present any mitigating proof because the outcome of the sentencing hearing had been predetermined. In the end, however, appellant allowed mitigating evidence to be presented, but stated it would not make a difference.

Following the appellant's conviction and sentence in the Captain D's murders, the jury consultant forwarded an unsolicited report to Dr. Auble expressing her concerns about appellant's mental capacities. The jury consultant advised Dr. Auble that appellant seemed consumed with irrelevant topics such as snacks and her accommodations at a bed and breakfast. The jury consultant also advised that the appellant would pass jokes to his attorneys and did not seem to conceptualize that he was on trial for his life. Dr. Auble related that she also received a memorandum from Ron Lax, a private investigator for the appellant, in July 1999. Mr. Lax summarized an interview he had conducted with appellant wherein appellant advised that the government had been trying to kill him for years. As examples, appellant advised: the government caused him to be in a car accident in November 1990; the government bombed the Murrah building on April 19, 1995, in Oklahoma City where he was scheduled to have an appointment; and the government framed him for the Captain D's murders. Dr. Auble confirmed that appellant was involved in a car accident in 1990 and that he lived in Oklahoma City at the time of the 1995 bombing. As for the 1995 bombing, appellant advised that he had overslept that morning and did not make his appointment. He further claimed that his apartment blew up the same day as the Murrah building bombing. Dr. Auble testified that she had documentation of a fire in his Oklahoma City apartment on that day. Additionally, Dr. Auble received information from Dr. Amador that appellant believed that all of the participants in the Captain D's trial, including the judge, jury and attorneys, were playing roles that had been scripted.

---

[1]Dr. Auble testified and her report actually states that the appellant advised her that he had been under surveillance by a "mimetic" field. However, Dr. Auble explained that Dr. Amador had advised her that appellant was referring to a magnetic field and she had simply misunderstood appellant.

Dr. Auble also reviewed correspondence from appellant's lead counsel in the Captain D's case. According to counsel, following the Captain D's trial, appellant refused to discuss the case with him. Later when appellant agreed to discuss the case, he advised his attorney that the jurors had been trying to "mouth" comments to him during the trial. It was also his belief that one of his attorneys had advised him that she would work hard to ensure that he was convicted. Additionally, appellant determined that he would not present any mitigation proof in the trial for the Baskin-Robbins murders. As a result, Dr. Auble contacted appellant's counsel in the current matter and expressed concerns about appellant's competency.

Subsequently, Dr. Auble interviewed appellant. At the August 18, 1999, interview, appellant refused to discuss whether he believed his first trial had been scripted, but advised that he had been set up to be killed. He advised her in the interview that his fingerprint that was found on a movie card that had been used in the Captain D's murders had been planted as well as the blood on his shoes.

Dr. Auble concluded that appellant was not competent to stand trial. She opined that appellant had four problems in terms of his competency. First, he suffers from delusions – delusions of surveillance, monitoring, and control by the government. She explained that following his first trial, appellant's attorneys had become a part of the delusions. He now believed that his attorneys had no free will; they were merely acting out a part of the plot to kill him. Second, appellant has difficulty conceptualizing. He focuses on irrelevant details. She opined that this problem stemmed from a brain injury he sustained. Dr. Auble testified that appellant had suffered multiple head injuries during his life. She related that he was unfocused and rambling, concentrating on irrelevant topics, which made it difficult for him to assist in his own defense. Third, appellant suffers from anosognosia, a condition in which mentally ill persons go to pathological lengths to conceal their mental illness in an attempt to appear normal. Dr. Auble testified that appellant had a very strong desire to appear normal. As a result, appellant did not want to present mitigating evidence. Dr. Auble explained that anosognosia is caused by neurological damage, often in the right hemisphere of the brain. This damage, she stated, could have been caused by a head injury appellant received as a child. Fourth, appellant has an increasing distrust of his attorneys. Appellant, therefore, avoided discussing his case with his attorneys.

On cross-examination, Dr. Auble agreed that appellant had been interviewed by more than a dozen mental health professionals during his lifetime. She could not recall seeing documents in the possession of defense counsel where appellant admitted that he suffered from symptoms of schizophrenia and bipolar disorder. She admitted that appellant requested medication for anxiety and depression in 1998. Dr. Auble further admitted that appellant was diagnosed as malingering by mental health professionals in Texas. She further testified that appellant admitted to her that he malingered in a Texas case in the late 1970s or early 1980s. During cross-examination, Dr. Auble admitted that appellant commented that he "fooled the shrinks for so long down there [Texas]." Dr. Auble also admitted that appellant was declared incompetent twice in connection with proceedings in Texas. Further, appellant also commented that he was not going to make the same mistake he made in the Houston case, but she interpreted that statement to mean that he did not want to be

declared incompetent again. While Dr. Auble admitted that appellant's history in Texas supported a conclusion of malingering, she testified that she did not believe that he was malingering in the present case. Dr. Auble explained that appellant's answers to testing in this case supported her conclusion that he was not malingering.

Dr. Auble acknowledged that her interview of the appellant on April 15 in which he told her that the outcome of the trial was predetermined, occurred just two hours after he had been convicted of two murders and one day before the sentencing phase of the trial was to begin. Dr. Auble also admitted that appellant discussed various aspects of his defense with his attorneys including: the size of the jury pool; his desire to focus on the guilt phase of the trial, rather than the sentencing phase; and whether plea bargains should be considered. Appellant changed his mind several times on the issue of presenting mitigating evidence. Dr. Auble further acknowledged during cross-examination that appellant wrote a college paper on the duties of an attorney and that appellant understood the duties of an attorney and the structure of the courtroom. Dr. Auble also admitted that appellant expressed dissatisfaction with the appearance of one of his attorneys who had a beard and long hair because appellant thought it looked unprofessional.

Dr. Xavier Amador, an associate professor of psychology at Columbia University, also testified on behalf of appellant as an expert in the field of clinical psychology. Dr. Amador testified that he has conducted extensive research of anosognosia, which he explained as a disorder that results after various types of brain injury, cancer, stroke, and closed head injury where the patient is left completely unaware of either the injury or aspects of the injury.

With respect to appellant, Dr. Amador testified that he reviewed appellant's medical history and examined him for over twenty hours during November 1998. In a report to appellant's counsel in January 1999, Dr. Amador expressed concerns about appellant's competency to stand trial, but concluded that he did not meet the standard for incompetency at that time. He asked counsel to keep him informed of appellant's behavior. At that time, although the appellant suffered from delusional beliefs and anosognosia, he was able to assist in his defense and therefore competent to stand trial. When appellant began to incorporate his attorneys and others assisting in his defense into his delusions, Dr. Amador grew concerned about appellant's ability to assist in his defense. The fact that appellant did not want to present mitigation proof of his mental illness also concerned him because appellant's reasoning was completely irrational. Dr. Amador testified that appellant told him that he had faked mental illness in the past and had even joked about it, but he was never actually ill. Notwithstanding this admission by appellant, Dr. Amador believed that appellant suffered from anosognosia, which was impairing his competency. Based on appellant's delusions and anosognosia, Dr. Amador concluded that appellant was not competent to stand trial.

Dr. Amador testified that appellant's delusional beliefs that his attorneys, the prosecutors and the judge were controlled by a surveillance team using subliminal magnetic technology and thereby had no free will, impaired his ability to consult with counsel. The fact that appellant referred to his legal counsel as "Satan" also impaired his ability to consult with counsel. Moreover, the fact that appellant believed that the jurors were "coached" impaired his rational understanding of the role of

juror in the trial. Dr. Amador opined that although appellant had a factual understanding of the legal process, he did not believe in that understanding in his trial. Dr. Amador further testified that appellant's delusions and anosognosia impaired his ability to disclose relevant and pertinent information to his attorneys. According to Dr. Amador, appellant was unable to relate his medical history, which impaired his ability to assist in a mental illness defense. In fact, appellant went "out of his way to thwart suggestions of pursuing any such defense."

Dr. Amador disputed the State's theory that appellant might be malingering. Dr. Amador testified that appellant's IQ is in the low average range, and he does not think appellant is capable of effectively faking a mental illness. Moreover, Dr. Amador explained that the examples he gave to Dr. Bernet of faking mental illness in the Texas proceedings were not even symptoms of any type of psychotic disorder. Dr. Amador further testified that once appellant was advised that a competency hearing would be held, it was not surprising that appellant would recant his delusions of a governmental plot to mental health professionals because he was trying to achieve the very specific goal of appearing normal. Dr. Amador further testified that he did not understand what the appellant could have gained by acting psychotic for decades and now suddenly telling the truth that he was malingering, as appellant advised the defense expert. Dr. Amador testified that other mental health experts may not have diagnosed appellant as suffering from anosognosia, because anosognosia is a "relatively new body of knowledge."

Dr. Amador admitted this was his first evaluation in a criminal case. He also admitted that appellant ultimately complied with counsel's recommendation that mitigation evidence be presented in the Captain D's murder trial. Dr. Amador further acknowledged that the fact that appellant received two death sentences in that case despite the presentation of mitigation evidence might cause the appellant to view the presentation of mitigation evidence as futile. Dr. Amador was also aware that appellant believed that if he did not allow mitigation evidence to be presented during the penalty phase, his attorneys would work harder on the guilt phase of the trial, and he was aware that appellant complained that his attorneys had not placed enough emphasis on the guilt phase during his first trial. Dr. Amador testified that he was aware that appellant recently told psychiatrists that he did not have delusions, that he faked having delusions in the past, and that he wanted to "come clean" and explain why he lied. Dr. Amador also acknowledged that several mental health professionals concluded that appellant had faked mental illness in the past.

Dr. William Bernet testified on behalf of the State as a psychiatrist. He is in charge of the forensic psychiatry program at Vanderbilt University. Dr. Bernet testified that he performed approximately three hundred competency evaluations of criminal defendants in Shelby County in connection with a previous job in Memphis and that he also performed several hundred competency evaluations at Vanderbilt when they contracted to do the mental evaluations for criminal defendants in Davidson County.

Dr. Bernet met with appellant on three occasions between December 1998 and the competency hearing, most recently the day prior to his testimony. Dr. Bernet testified that appellant understood the legal process and was able to cooperate and communicate with his attorneys.

Appellant explained who his attorneys were and the need to trust them, even though he believed it might have been better to have a private attorney representing him rather than the public defender. Appellant discussed his case with Dr. Bernet and advised that he and his attorneys disagreed over certain aspects of his case. One such disagreement occurred when he and his attorneys discussed the possibility of a plea bargain. He advised that although his attorneys encouraged him to accept a plea bargain, he could not do so because he was innocent and an innocent person would not plead guilty and agree to serve a life sentence. Appellant also discussed various aspects of his trial strategy with Dr. Bernet, including how he thought his attorneys should handle certain witnesses, DNA evidence, and an alibi defense.

Dr. Bernet further testified that appellant discussed potential mitigation proof that could be presented in the penalty phase. Appellant advised he could present evidence of atrophy of his brain, dyslexia, his low intelligence level, a troubled childhood, an alcoholic father, and his placement in a boy's home. He also explained that he did not want his sister to testify because she was a school teacher, it would cost her too much to attend the trial, and it was difficult for his sister when she testified at the first trial. Appellant advised Dr. Bernet that he did not want his attorneys to present evidence that he suffered from a serious mental disorder, because he did not.

Dr. Bernet opined that appellant suffered from antisocial personality disorder, a tendency to malinger, or feign mental illness, and delusional paranoia. Dr. Bernet testified that appellant malingered both by exaggerating his suspicious nature and by denying that he had suspicious thoughts. Appellant denied that he was under governmental surveillance and advised that he made those claims up in order to get attention. Appellant further told Dr. Bernet that he did not believe that his previous trial was scripted and did not believe that the people involved in the trial were merely playing roles.

Dr. Bernet described appellant as a "very affable, friendly person, who likes to be friendly and chat about things. In a sense, his being that friendly might be perceived as being mildly inappropriate in that it goes a little beyond sort of the business purpose of the meeting, but I just think that's the way he likes to be." Dr. Bernet felt that appellant liked to "present himself in a very positive light, in a very upbeat light and [that he] like[d] to be perceived as being a healthy, intact person." Dr. Bernet also explained the appellant "cons people and he doesn't show his full deck or his full hand. That he tries to manipulate people in one way or the other, and I think that happens frequently and I suppose that anybody that has to deal with . . . [appellant], has to keep that in mind." Dr. Bernet felt that "when he [appellant] makes a point with you, maybe there is some reason, manipulative reason why he is trying to make that point with you and you would have to consider that."

Dr. Bernet concluded that although appellant suffered from mental problems, those problems did not render him incompetent to stand trial. Dr. Bernet testified appellant understood the charges against him, how the legal process worked, understood the possible outcomes of the trial, and was able to cooperate and communicate with his attorneys. As a result, appellant was legally competent to stand trial.

Dr. Cynthia Turner-Graham, a board-certified psychiatrist who serves as the vice president of medical services for Centerstone Community Mental Health Centers, testified as an independent expert. Dr. Turner-Graham interviewed the appellant at the request of the trial court prior to the competency hearing.

Dr. Turner-Graham opined that appellant understood the nature of the legal process, understood the charges pending against him and the consequences that could follow, and could advise counsel and participate in his own defense. According to Dr. Turner-Graham, appellant understood that he was indicted on two counts of murder that he claimed he did not commit. He believed that he could present a successful defense by establishing an alibi of his whereabouts at the time of the crime and by disputing DNA and fiber evidence. Appellant acknowledged that his attorneys have his best interest at heart, but he and his attorneys sometimes disagree about the best approach to take with his defense. Appellant also believed that overall he had a good working relationship with his attorneys. Appellant also understood that the presentation of mitigation evidence during the penalty phase of the trial would be an effective defense strategy and listed several potential mitigation possibilities. Appellant was also able to describe court proceedings in detail to Dr. Turner-Graham. Appellant understood the possible sentences he faced included life imprisonment, life without parole or death. Appellant estimated that the likely outcome of his trial was a "50/50 chance of being found not guilty." Dr. Turner-Graham found that appellant had a history of malingering and deception, and appellant "admitted that he often chooses to do that which is most expedient given the realities of the current situation." Dr. Turner-Graham further found that although the appellant's motivations were "colored by his psychopathy," which caused difficulties in working with him, it did not render him incompetent to stand trial.

Dr. Turner-Graham noted appellant's organic brain injury was likely the etiology of his psychotic symptoms as described by other mental health professionals in their reports. During her interview of appellant, he denied that he ever believed that he was under government surveillance. Instead, appellant advised her that he had "fabricated stories" to "achieve certain things at certain times." Appellant also advised Dr. Turner-Graham that he never actually believed that his prior trial had been scripted or predetermined. He explained that he may have been "over wrought" by his conviction and may have made statements that indicated he believed the court proceedings were predetermined. He did not hold that belief either at the time of his first trial or at the time of his evaluation.

Dr. Turner-Graham determined that appellant's antisocial personality disorder influenced his behavior as much or more than his psychotic symptoms over time. Dr. Turner-Graham explained that although the presentation of an antisocial personality can appear psychotic, it is not psychotic in the classical sense. Dr. Turner-Graham concluded that "because symptoms of classic psychosis are not presently active and/or he is not able to circumscribe them to the extent that he can control their expression, . . . [appellant] is clearly competent to stand trial."

Based on the foregoing, the trial court determined that the appellant was competent to stand trial.

## Guilt phase

Angela Holmes and Michelle Mace worked the night shift at Baskin-Robbins ice cream store on Wilma Rudolph Boulevard in Clarksville, Tennessee the evening of April 23, 1997. Angela Holmes was the manager of the ice cream store. At some point during their clean-up procedure, the two women were kidnapped. The last person known to see them working in the store was Lavanda Zimmerman. Ms. Zimmerman arrived at Baskin-Robbins between 9:20 and 9:25 p.m. She purchased a scoop of ice cream and sat in the store eating her ice cream and talking to Ms. Holmes and Ms. Mace until approximately 10:00. According to Ms. Zimmerman, the ladies laughed and made small talk with her as she ate her ice cream; they also began to clean the store.

While she was in Baskin-Robbins, Ms. Zimmerman saw one college-aged couple come in, order ice cream, and leave. Subsequently, a man in his late twenties or early thirties entered the store, inquired about the price of one of their products, became very loud and obnoxious concerning the price, which he believed to be too high, and exited the store. Ms. Zimmerman described the man as wearing blue jeans, a dirty t-shirt and a baseball cap. She related that the man appeared unclean and unshaven. Ms. Mace took a couple of orders through the drive thru while Ms. Zimmerman was in the store.

The Baskin-Robbins employees began to clean the customer area of the store at approximately 9:45 p.m.. One of the employees locked the side door that faced a Prudential Insurance agency prior to Ms. Zimmerman's departure. Ms. Zimmerman looked at her watch at 9:58 while she was still in the store. She then exited the store through the front door, which faced Wilma Rudolph Boulevard. It was Ms. Zimmerman's belief that Angela Holmes locked the front door of the store with the key as she left. At 10:01, Ms. Zimmerman pulled out of the Baskin-Robbins parking lot.

As she exited the Baskin-Robbins parking lot onto Wilma Rudolph Boulevard, Ms. Zimmerman noticed a red car slow down and turn into the parking lot. At trial she testified that the red car appeared new and shiny and looked like her husband's Ford Excel. Ms. Zimmerman, however, gave differing descriptions of the car prior to trial. Ms. Zimmerman admitted that she had told a private investigator during a May 15, 1998, interview that the car she saw was "dark reddish or maroon" in color and looked like an old style. She also admitted that she did not advise the TBI of the red car during her first interview on May 15, 1997.

Steve Jones, Director of Emergency Management in Montgomery County, also went to Baskin-Robbins the night of April 23, 1997. At trial, he recalled that he showed Michelle Mace how to use her mop properly, made his purchase, and left the store at approximately 9:45 p.m. While he was in the store, a young couple came in and a few vehicles came through the drive thru. He did not recall seeing Ms. Zimmerman in the store.

Tammy Thompson and her boyfriend, Dustin Keller, both students at Austin Peay State University, arrived at Baskin-Robbins around 9:50 p.m. in a red 1993 Nissan Sentra. Ms. Thompson recalled seeing other vehicles in the parking lot when they arrived, but Mr. Keller did not recall seeing any other vehicles in the parking lot. They both saw a man in the store with salt and pepper hair. Ms. Thompson described the man as scraggly, with shoulder length hair. Both witnesses testified that the man they saw in the store was not the appellant.

Catherine Naylor drove by Baskin-Robbins at approximately 9:48 p.m. on April 23, 1997. She testified that as she drove by the Baskin-Robbins, she looked into the parking lot and saw a dark red, "maroonish" car in the lot. Her description of the make of the car varied from a 1987 Sundance to a Grand Am to a Dodge Shadow. She testified that the car she saw was not a 1997 Ford Escort. She viewed photographs of appellant's car and testified that the car she saw could not have been appellant's car. Ms. Naylor also saw a green Corvette pull into the Baskin-Robbins parking lot.

Craig Mace, Michelle Mace's brother, arrived at Baskin-Robbins shortly after 10:00 p.m. Mr. Mace watched two to three minutes of the 10:00 news and then left his home to pick up his sister from work. He estimated that he left his house around 10:07 p.m. and it took approximately two minutes to drive to Baskin-Robbins. The store closed at 10:00 p.m, and Craig expected his sister to be ready to leave between 10:10 and 11:00 p.m, depending upon how busy the store was that night. He saw Angela Holmes's green Geo Metro parked in the parking lot upon his arrival. The outside lights of the restaurant were turned off, and the lighting outside was, therefore, very dark. When his sister did not come out to the car within ten to fifteen minutes, he became worried. He had not seen any movement in the store. He called his sister Kelly, who was also employed at that Baskin-Robbins, and asked her to call the store to determine what was taking so long. When Kelly advised him that there was no answer at the store, he asked her if it would be okay for him to go in the store.

Mr. Mace entered the ice cream store through the front door facing Wilma Rudolph Boulevard, which was unlocked. He saw no signs of a disturbance. The lights in the work area of the store were on, but the lights in the dining area were off. The freezer door was open, and the light in the freezer area was on. Mr. Mace went outside, called 911, and reported his sister and Angela Holmes as missing. He estimated that he was at Baskin-Robbins for approximately twenty minutes prior to his phone call. He waited approximately ten minutes, and when there was no response from 911, he called his parents. Kelly Mace called Tobaris Holmes, Angela's husband, to determine if he had heard from Angela. Mr. Holmes also tried to contact the store, but was unsuccessful. Kelly Mace and her boyfriend, Michael Wilson, drove to the Holmes residence. Mr. Holmes left with Michael Wilson for Baskin-Robbins, while Kelly Mace stayed behind with the Holmes's four-month-old daughter. Tobaris Holmes, Michael Wilson, and Michelle Mace's mother and stepfather arrived shortly thereafter. In the meantime, Craig Mace made a second call to 911, but still no emergency personnel arrived.

Craig Mace, his stepfather James Black, Tobaris Holmes, and Michael Wilson entered Baskin-Robbins. Mr. Holmes had worked at Baskin-Robbins for a brief period and was, therefore,

very familiar with the store. Mr. Holmes testified at trial that upon entry to the store, he looked all around. He noticed that the cash registers were empty, the freezer door was open, and the top to the safe was gone. He also saw his wife's purse and picked it up, but later sat it back down. Craig Mace also noticed both of the employees' purses in the office area during his second entry into the store. After being in the store one to two minutes, Craig Mace went back outside and made a third call to 911.[2] Tobaris Holmes testified at trial that he was in the store for three to four minutes. Mr. Holmes also testified that his wife's car was in the parking lot. According to Mr. Holmes, the parking lot was dark because the outside lighting was turned off and had been off when they arrived.

The Clarksville police arrived at Baskin-Robbins at 10:51 p.m. Thereafter, the investigation into the disappearance of Angela Holmes and Michelle Mace began. The authorities' search for the two young women ended the following morning at Dunbar Cave State Park, where the bodies of both victims were found. Jack Hackett found a dead body lying face down in the lake located at Dunbar Cave State Park on the morning of April 24 while exercising with his dog. He contacted the park ranger, who called the police. Officer Cheryl Anderson discovered another dead body lying in a wooded area near the lake. The investigation determined that Angela Holmes's body was found in the lake, and Michelle Mace's body was found in the wooded area. The fathers of both of the victims identified their bodies at the morgue.

A videotape of the crime scene at Dunbar Cave State Park was recorded by the TBI and introduced as an exhibit at trial. Two latex gloves were found at the scene. A member of the Clarksville Police Department found one of the gloves floating in the water off the bank of the lake. The videotape shows the body of Angela Holmes. A Baskin-Robbins apron was used as a ligature to tie her hands.

Many witnesses came forward during the investigation relating suspicious activity in and around the Baskin-Robbins and the Dunbar Cave areas on the night in question and before. A few witnesses believed they saw appellant in the Dunbar Cave park prior to the murders. Loretto Diorio and her four children went to the Dunbar Cave State Park on February 17, 1997, for a nature walk. Ms. Diorio, who homeschooled her children, testified at trial that she arrived at the park on Wednesday, February 17, 1997, shortly after lunch. Ms. Diorio believed they may have arrived at Dunbar Cave as early as 12:30 or 1:00 p.m. While they were on their walk, they saw a man singing country music and playing the guitar. She testified at trial that they paused when they saw him and then continued on their walk. She remembered seeing the man because he seemed to follow them. She testified that when they arrived to feed the ducks, he was right behind them. She explained that he came within a few feet of them. At that point, they hurried along and left.

_____

[2]Larry Bryant, Director of Montgomery County 911 Emergency Operations, testified at trial and confirmed that Craig Mace made 3 calls to 911 on April 23, 1997, beginning at 10:25 p.m. According to Mr. Bryant, the first police unit was dispatched at 10:49 p.m. Mr. Bryant explained there was a delay in dispatching a unit due to heavy volume that night and the operator's difficulty understanding Craig Mace's call from a cell phone.

After the investigation into the murders of Ms. Holmes and Ms. Mace began, Ms. Diorio saw appellant's picture on television. She thought he was the man she saw at Dunbar Cave and identified appellant as the man she saw at Dunbar Cave on February 17, 1997. She testified at trial that she remembered the ears and face of the man she saw on the day of the nature walk. On cross-examination, she admitted that she could not testify that she was one hundred percent sure appellant was the man she saw.

Stephen Diorio, Loretta Diorio's twelve-year-old son, also testified at trial. He too thought appellant was the man they saw at Dunbar Cave on February 17, 1997. Stephen Diorio also admitted, however, that he could not state that he was one hundred percent sure that appellant was the same man. Stephen Diorio testified that the man he saw was wearing a cowboy hat, tipped down, and sunglasses. He also admitted that the area where he saw him playing the guitar and singing was dim.

At trial, the defense attempted to contradict the testimony of the Diorios by showing that on February 17, 1997, appellant was in class at Volunteer State Community College in Gallatin. The defense introduced attendance records that showed that appellant was in class from 10:00 a.m. until 12:10 p.m. Further, Janice Roark, the director of admissions and records at Volunteer State Community College testified that it takes approximately one hour to drive from Gallatin to Clarksville. On cross-examination, Ms. Roark testified that she did not know what time appellant left his class. She further admitted that even if appellant left class at 12:10 p.m., he could have been in Clarksville by 1:10 p.m.

Barbara Jayroe also believed she saw the appellant at Dunbar Cave State Park prior to the murders. Ms. Jayroe took her grandchildren, accompanied by a friend, to the state park on April 8 or 9, 1997, to play. They arrived around 11:00 a.m. While there, she noticed a "well-groomed" man with brown hair, wearing jeans, a blue short-sleeved shirt, and black and white tennis shoes. Ms. Jayroe testified that she first noticed the man because of his "round butt." She also saw several cars in the parking lot, including a four-door, shiny red car. After seeing appellant's picture on television, she notified police that she saw appellant at Dunbar Cave prior to the murders. On cross-examination, Ms. Jayroe admitted that she told the police she would have to see appellant from the rear to determine if he was the man she saw at the park. She also admitted that she told the police she believed the man she saw was five feet, eight or nine inches, and appellant is six feet, three inches. She further told the police in June 1997 that she was not sure appellant was the man she saw at the park, although she testified at trial that he was the man she saw.

In addition to possible sightings of appellant in Clarksville at Dunbar Cave prior to the date of the murders, the testimony of Elfreida Lane, a friend of appellant's, and appellant's purchase of gasoline at a Texaco station both placed him in Clarksville on the night of the murders. Elfreida Lane testified at trial that appellant called her April 24, 1997, the day following the murders, and told her he was in Clarksville the night before. She specifically remembered that he called April 24 because it was her daughter's birthday. When he called on April 24, appellant told Ms. Lane that he was in Guthrie, Kentucky purchasing lottery tickets the day before. He told Ms. Lane that he was

going to stop by her house that night, but it was too late. Ms. Lane explained that she developed a friendship with appellant while he worked at Shoney's as a cook in Nashville at the Murphy Road restaurant. She explained that appellant left his employment at Shoney's in 1996 and returned to his home state of Texas. Prior to his departure, she attended a going away party for appellant at the Logan's restaurant in Clarksville.

In January 1997, Ms. Lane received a telephone call from appellant advising her that he had returned to Tennessee. From February 1997 to April 24, 1997, appellant called Ms. Lane once or twice a week. Ms. Lane testified that most of these calls were made in an attempt by appellant to be re-hired at Shoney's. Approximately one week prior to the murders, on or about April 18, 1997, Ms. Lane's daughter called her at work and told her appellant called their home. Appellant advised Ms. Lane's daughter that he was in town and was going to stop by their house. Ms. Lane testified that appellant had never stopped by their house before, and she got a bad feeling about it. By the time she drove from Shoney's in Nashville to Clarksville, appellant was at her house. He told Ms. Lane that he was passing through Clarksville. Because Ms. Lane had to get a tire repaired, appellant followed her to drop off her car and took her home. Appellant spent the night at Ms. Lane's house that night so that he could drive her to work in Nashville at 4:00 a.m. She testified that she did not hear from him again until the April 24 phone call.

Although Ms. Lane testified that she had developed only a friendship with appellant, on cross-examination, she admitted that she kept in touch with appellant while he lived in Texas. Several cards were introduced into evidence in which she expressed her love for him and referred to him affectionately. Despite this evidence, she denied that she was ever in love with appellant. When she was questioned as to whether appellant had said in the April 24 phone call that he had been in town the day before or night before, she replied he said it was late and too late to stop by. She could not remember if appellant attempted to call her the afternoon of April 23. Ms. Lane also testified that when appellant visited her home the week prior to the Baskin-Robbins murders, appellant was driving a new red car, but she did not know the make of the car.

Two representatives associated with Texaco testified that appellant purchased gasoline using a Texaco credit card at a Texaco convenience store located on Rossview Road in Clarksville on April 23, 1997. Paul Barrs, who worked with the company that operated the Texaco, testified that his company keeps the original receipt of all credit card purchases made at the convenience store. He identified a signed credit card receipt from April 23, 1997, which showed that the appellant purchased $11.95 worth of gasoline at 9:45 p.m. Handwriting experts confirmed that the signature on the receipt was in fact appellant's signature.

Additionally, Jimmie Jones, manager of merchant sales for the Shell/Texaco Saudi Arabia Lines, testified that he was responsible for the settlement of all the credit card transactions back to Texaco and Shell dealers. His company's records reflected that a purchase of $11.95 was made at the Rossview Road Texaco station at 9:52 p.m. on April 23, 1997, on credit card number 1163025487-09001. Mr. Jones testified that there could be some time differential between the time recorded on the register at the sale location and the time recorded by the host computer in Houston,

Texas. Additionally, officer Patrick Postiglione testified that during a search of appellant's home in Nashville, a Texaco credit card was found in appellant's wallet in the name of Paul D. Reid, matching the account number shown on the Texaco receipt that was admitted into evidence.

Several witnesses reported seeing a red car either in the vicinity of Baskin-Robbins or Dunbar Cave State Park on April 23, 1997, but the descriptions of the car varied. Appellant leased a 1997 red, four-door Ford Escort with gray interior from Crown Ford in Nashville in February 1997; he pre-paid the lease amount of $5,700 at that time and accepted delivery of the vehicle in March. Linda Patton, a woman appellant dated while he resided in Texas during 1996, co-signed on the lease for appellant. The car did not include floor mats; therefore, appellant purchased gray floor mats from a Wal-Mart store in Gallatin on March 25, 1997. The sales person that leased the car to appellant testified that he specifically explained to appellant that the car had childproof locks on the back doors, which if activated would restrict anyone from opening the rear doors from the inside of the car.

George Hertenstein was one of the witnesses that notified the police that he saw a red car on the night of April 23, 1997, near Baskin-Robbins. In June 1997, Mr. Hertenstein called the police and advised them that on the night of April 23, 1997, he traveled from his home to the Trane Company to report to work. During his commute to work that evening, he followed a red car from the Texaco on Rossview Road to Union Hall Road, which is the first road after the Baskin-Robbins entrance. Mr. Hertenstein testified at trial that he remembered that the taillights of the car he followed were a tear-drop shape that wrapped around the side. Mr. Hertenstein recalled that the car slowed down right in front of Baskin-Robbins. When he attempted to pass the car, the car abruptly turned off onto Union Hall Road. He traveled on to work, which he estimated was a quarter mile beyond where the red car turned. He testified at trial that his watch showed that it was 9:59 p.m. when he pulled into work. He stated that his watch may have been fast by three to four minutes. He identified two pictures of appellant's car as being identical to the car he saw on April 23, 1997. Mr. Hertenstein admitted on cross-examination that he saw pictures of appellant's car on a television news report prior to talking to the police. He also admitted that in April 1998 he told private investigators that the car he saw had two doors, and appellant's car had four doors.

Jerry Pardue knew Michelle Mace and had even gone on a couple of dates with her. He testified that he often stopped by Baskin-Robbins after he left work; therefore, he knew several of the employees. On the night of April 23, 1997, Mr. Pardue completed his shift at Precision Printing, left Precision at 10:02 p.m., and was in the vicinity of Baskin-Robbins around 10:07 or 10:08. As he approached Baskin-Robbins, he slowed down. He saw Angela Holmes's car in the parking lot and a red car in the back of the parking lot that was shared with Anytime Storage. At trial, he recalled that the red car was parked in front of the storage facility's office, with the headlights of the car facing the drive-thru window at Baskin-Robbins. He testified at trial that he could tell the car was a small, red car. He testified that the car pictured in exhibit 39, appellant's car, could very well be the car he saw the night of April 23, 1997. Mr. Pardue further testified at trial that he slowed down in front of Baskin-Robbins and looked in the store for seven to eight seconds. He noticed that some of the interior lights were on inside the store, but the exterior lights had been turned off. He

recalled that it appeared dim inside the store, as it did when the employees were closing. He also saw a mop bucket in front of the customer area, but did not see anyone inside the store. He did not stop. On cross-examination, Mr. Pardue admitted that he had told TBI investigators that the red car he saw appeared to be a two door hatchback that looked like a GEO Metro, but he testified at trial that he was not sure about that at all. He also admitted that he told the investigators that the car had black bumpers, but he explained that he knew the car did not have chrome bumpers. The bumpers of the car could have been either black or painted the same color of the car.

Jay Smith also saw a red car on the evening of April 23, 1997. Jay Smith, his girlfriend Holly Schmidt, and Shannon Reeves went through a McDonald's drive thru on Riverside Drive in Clarksville at 10:28 p.m. They drove to Ms. Schmidt's house at 338 Old Dunbar Cave Road, which took them five to ten minutes. Ms. Schmidt's house is located across the street from an entrance to and parking lot for Dunbar Cave State Park. Mr. Smith recalled at trial that immediately before turning into Holly's driveway, he saw a car parked in the parking lot of the state park. The car was not in a parking space. The front of the car was facing Holly's driveway, and the taillights were facing the lake. The headlights of the car were off. The car was a red four-door, and it appeared that the windows were tinted. Mr. Smith was unsure about the make of the car. Smith testified that when they arrived at Holly's house, they went inside, and he did not see the car again.

Mr. Smith testified that he was a friend of Michelle Mace, and that he had received a call early the morning of April 24, 1997, concerning her disappearance. Mr. Smith admitted on cross-examination that he told investigators early in May 1997 that the car looked like several different makes of cars, none of which matched appellant's car. Furthermore, Mr. Smith admitted that he contacted police on May 27, 1997, and gave them a license tag of a red Nissan Pulsar that he thought could have been the car he saw in the parking lot. Finally, Mr. Smith testified at trial that the car that he saw on the night of April 23, 1997, was consistent with the pictures of appellant's automobile that were introduced into evidence.

Shannon Reeves testified that he was in the back passenger seat of Smith's car on the drive from McDonald's to Holly Schmidt's house across from Dunbar Cave State Park. According to Mr. Reeves, when they arrived at Holly's house, they stood outside and talked for a while. He noticed the car across the street in the parking lot of Dunbar Cave. He could not make out any of the details of the car. In fact, he testified that while they stood outside, the car had its headlights on and actually changed the headlights from a regular beam to high beam. He recalled that he wondered what was going on. He testified that he may have seen the silhouette of a person outside the car, but there definitely had to be someone inside the car because the lights changed from regular to high beam. He admitted that he told investigators that he thought the car might have been a hatchback.

Barbara McWilliams and Martin McIntyre testified during the defense's proof. They both worked at Riverbend Maximum Security prison in Nashville. After work on April 23, 1997, they drove separately to Dunbar Cave State Park. They parked in the parking lot across the street from Holly Schmidt's house. They estimated that they arrived between 10:50 and 11:00 p.m. Ms. McWilliams was driving a black Ford Contour, and Mr. McIntyre was driving a blue 1995 Chevrolet

Cavalier. They parked their cars in the opposite direction of each other in the parking lot so that the driver's side doors faced each other. They got out of their respective vehicles to get information related to reserving a cabin at the park. Neither saw any other vehicles in the parking lot while they were there. Mr. McIntyre estimated that they left ten to fifteen minutes after their arrival. Ms. McWilliams testified that they left the parking area between 11:20 and 11:30 p.m.

Shaun Furmanek was at his girlfriend's house on the night of April 23, 1997. Mr. Furmanek's girlfriend, Jennifer Schmidt, also lived at 338 Old Dunbar Cave Road, which is across the street from Dunbar Cave State Park. He testified that he went outside to smoke a cigarette and saw two cars parked in the parking lot. One of the cars was facing his girlfriend's house and the other car was facing away from her house. He could see the silhouette of heads in the cars but he could not see the color of either of the cars. He estimated that he saw the cars between 7:00 p.m. and midnight. He recalled that Jay Smith and Shannon Reeves arrived at the Schmidt's house after he saw the cars in the parking lot.

Due to the reports of the various witnesses who saw a red car either in the vicinity of Baskin-Robbins or the Dunbar Cave area on the night in question, Detective Robert Miller was required to travel the various routes potentially taken by the appellant and the witnesses, measure the distances involved, and determine the time it took to drive those routes, as part of his investigation. At trial, Detective Miller testified that he drove from Elfreida Lane's residence, 2015 Sweetbriar, to a Texaco convenience store at the intersection of Warfield Boulevard and Rossview Road. According to Detective Miller, this distance was .7 miles, which took him approximately one minute to drive. Detective Miller then drove from the Texaco to the Baskin-Robbins at issue, which is a distance of .9 miles and takes approximately three minutes to drive. Next, Detective Miller testified that he measured the distance from Baskin-Robbins to the Dunbar Cave area via three different routes. The routes ranged in distance from 3.6 miles to 2.1 miles, and the time for driving those routes ranged from five minutes to four minutes. Detective Miller also drove two routes from a McDonald's restaurant in Clarksville to the Dunbar Cave area, a distance of 4 to 4.5 miles, which took approximately eight minutes to drive. Detective Miller testified that Guthrie, Kentucky was approximately a five minute drive from the exit four interchange near the Baskin-Robbins on Wilma Rudolph Boulevard.

Detective Miller was also involved in the investigation of the robbery at Baskin-Robbins. When the detectives arrived at Baskin-Robbins following the disappearance of Ms. Holmes and Ms. Mace, they found the top to a floor safe on the office desk. The only money found in the store was in the purses of the two employees and in a small banker's box in the office, which contained mostly coins. None of the money bags kept in the regular course of business were located. Three fingerprints were lifted from the ice cream cooler area and other areas of the store. The detectives also found shoe prints in the store. During the course of the investigation, shoes from several individuals were sent to the TBI crime lab for testing. Additionally, the store recorded the interior area via a television in the office. The videotape from the store video recorder was never found.

Todd Halliday, part-owner of the Baskin-Robbins at issue, testified that each day four start-up money bags were provided to the employees containing $100 each for the purpose of making change. At the end of each day, the employees closed out each register, put the money from the sales of the day into the money bags, and placed the bags in the safe. According to Mr. Halliday, the sales for April 23, 1997 totaled $1,165.58. Therefore, including the $400 in start-up money, the store would have had $1,565.58 in cash. None of this money was ever recovered following the April 23 disappearance and murders of the store employees. Mr. Halliday further testified that the two exterior doors to the parking lot were equipped with panic doors. In order to lock the doors, an employee would turn a screw on the panic bar with a screwdriver, which would cause the door to lock each time it was shut. No key was needed to unlock the panic bar from inside. Instead, someone merely had to push the panic bar in order to open it. A key was required to unlock the door from the outside.

Two of appellant's former Shoney's co-workers testified that appellant engaged in conversation concerning robbery of fast-food restaurants as a means of making money. Danny Tackett testified that appellant was in dire straits financially. During a January 1997 conversation, appellant told Mr. Tackett that given his size and Tackett's speed, they could "go anywhere and get anything." Appellant then asked him how he thought they could make money, and Tackett replied that they could rob a fast-food restaurant in the middle of the night when there would be no witnesses. Mr. Tackett admitted on cross-examination that appellant often made jokes, and he thought appellant was joking when the comments were made.

Jeffrey Potter testified that in January 1997, just prior to appellant's termination from Shoney's, appellant told him that robbery was an easy way to make money without having to work for it. Mr. Potter admitted that he had previously stated that this conversation with appellant occurred in the summer of 1996. Further, Mr. Potter admitted that he did not tell the police about this conversation when they first interviewed him on June 7, 1997.

Linda Patton, appellant's girlfriend from Texas, visited appellant on May 3, 1997. Appellant had sent her a letter dated April 24, 1997, in which he stated that he was enclosing a $125 money order to pay for half of her airfare. The money order was not actually enclosed, but she received another letter dated April 26, 1997, that did include the money order. During her visit to Nashville, they stayed at a motel and visited various Nashville tourist attractions, all of which appellant paid for. She believed that he paid for everything with cash, but the defense presented proof to show that he paid for some of the attractions with a credit card. At the time, appellant had a balance of only $66.72 in his checking account.

DNA and fiber testing were conducted as a part of the investigation of the murders. Blood samples were drawn from appellant and the body of Angela Holmes. Blood from the t-shirt Michelle Mace was wearing was used as her blood sample. Shelly Betts, an employee of the TBI serology and DNA unit, established DNA profiles from the blood sample taken from Angela Holmes and the blood on the shirt of Michelle Mace. She used the polymerase chain reaction (PCR) process to determine the DNA profiles.

Samero Zavaro, also a serology and DNA specialist with the TBI, established a DNA profile of appellant using the PCR method. She also tested two brown Nike tennis shoes removed from appellant's home during a search. Her testing revealed that human blood was present on both shoes. Testing of the blood on the left shoe excluded Michelle Mace and appellant as donors, but included Angela Holmes. She testified that the probability of selecting an unrelated individual that would have the same profile in the Caucasian population was 1 in 6,800 individuals and was 1 in 4,400 individuals in the African-American population. The blood stains on the right shoe were very small; therefore, Zavero testified she combined the blood stains in order to have enough to test. In establishing the profile, she determined that it was consistent with multiple donors. When she compared the profile to the samples from appellant, Holmes, and Mace, appellant was excluded as a donor, but neither Ms. Holmes nor Ms. Mace could be excluded. Zavaro could not give any statistics or percentages as to the probability of an unrelated individual to Mace or Holmes as being the donor of the sample, because the blood was a mixture.

Meghan Clement, an associate director in the forensic identity testing department at Laboratory Corporation of America Holdings Incorporated ("LabCorp") conducted additional DNA testing. Ms. Clement performed a PCR DNA analysis and looked at six markers other than those utilized by the TBI. As to the left shoe, LabCorp's testing revealed reportable results at three of the six markers tested. The profile obtained was consistent with Angela Holmes's profile. Clement testified that the odds of selecting an unrelated individual that had the same profile at those three locations was 1 in 465 in the Caucasian population, 1 in 2,911 in the African-American population, and 1 in 639 for the Hispanic population. From the appellant's right shoe, she was able to develop a profile from four of the locations that they tested and determined that there was a mixture of DNA from more than one individual. She further determined that neither of the victims nor the appellant could be excluded as possible donors. She also did not calculate statistics on blood mixtures. Ms. Clement explained that her results were different from the TBI testing because the markers used by the two laboratories were different.

Ms. Clement also performed a combined statistical analysis of the DNA on appellant's left shoe. She testified that when the six locations that the TBI tested were combined with the three reportable results that she tested, the probability that a person unrelated to Angela Holmes was the donor of the blood was 1 in 3,250,000 for the Caucasian population, 1 in 1,810,000 in the African-American population, 1 in 4,950,000 in the southeastern Hispanic population, and 1 in 4,520,000 in the southwestern Hispanic population. Furthermore, she explained that based upon her combined statistical analysis, she determined that appellant could be absolutely excluded from the DNA present on the right shoe.

Dr. William Shields, professor of biology at the State University of New York College of Environmental Science and Forestry at Syracuse University, testified for the defense as a zoology and DNA analysis expert. Dr. Shields questioned the combined statistical analysis of appellant's left shoe used by Ms. Clement. After Dr. Shields adjusted for errors he claims Clement made in conducting the combined statistical analysis, he opined that the probability that an individual unrelated to Ms. Holmes contributed to the sample on the left shoe was between 1 in 122,000 and

1 in 12,000,000 in the Caucasian population, with the best estimate being 1 in 1,200,000. Dr. Shields further challenged the methodology of combining the stains from the right shoe to establish a DNA profile. Dr. Shields testified that the PCR process used by Zavaro could obtain DNA from a single cell; therefore, there was no reason to mix the stains.

Linda Littlejohn, who works in the trace evidence unit of the TBI crime laboratory and specializes in fiber comparisons, testified that she took hair samples from the victims for testing purposes and removed an apron from Angela Holmes's body that was used as a ligature to tie her hands. She also received articles of the victims' clothing, photographs of shoe prints from Baskin-Robbins, nine pairs of appellant's shoes, and eight pairs of shoes belonging to other people. None of the shoe prints from Baskin-Robbins or Dunbar Cave matched appellant's shoes.

Appellant's car was vacuumed for trace evidence. In addition, the TBI agents took upholstery, carpet, and floor mat samples from the car for testing the presence of blood. Agent Littlejohn also took fiber samples from the backseat of the car, the back floor mat, and the carpet of the car. She also collected debris from the victims's clothing. Agent Littlejohn testified that when she tested Angela Holmes's clothing, she found two gray polyester fibers consistent with the seat sample taken from appellant's car and one gray trilobel olefin fiber consistent with the floor mat sample. With respect to Michelle Mace's clothing, she found two gray polyester fibers consistent with the seat sample, one green polyester fiber consistent with the polyester seat sample, one gray nylon fiber consistent with the carpet sample, and three gray olefin fibers consistent with the olefin seat sample. Additionally, fiber on Michelle Mace's shoes was consistent with fibers from the floor mat sample from appellant's car. Agent Littlejohn also found a fiber on one of appellant's shoes that was consistent with the floor mat sample from his car. Agent Littlejohn testified that in her experience it was "a very rare case that you find eleven fibers that match one source." The defense attempted to rebut this evidence with testimony as to the popularity, and thus volume, of the Ford Escort and car mats sold throughout the United States.

Robert McFadden, a forensic scientist employed by the TBI, testified that fingerprint testing was conducted in the course of the investigation. One of the fingerprints found at Baskin-Robbins matched a print from Michelle Mace. Appellant's car was also tested. Agent McFadden explained that when the appellant's car was recovered and processed, it was "very clean." Therefore, prints would be undetectable, unless they were left very recently after the cleaning. Prints were recovered from the car, but none matched either of the victims' prints or the appellant's. Moreover, seven prints found on pieces of paper in appellant's car all matched prints from the appellant.

Dr. Charles Harlan performed the autopsies on the victims. He testified that Angela Holmes died as the result of an incision to the neck. She had multiple stab wounds, including non-penetrating stab wounds to the head. The stab wound to Ms. Holmes's neck was a deep wound that went "all the way to the backbone." The wound transected the left common carotid artery and the jugular vein, injured the spinal column, and cut into the backbone in two areas. Angela Holmes died as a result of blood loss from the neck wound. According to Dr. Harlan, she survived for a period of five to ten minutes and was conscious for approximately eighty percent of the time from the

infliction of the injury to the time of death. Dr. Harlan testified that the stab wounds could have been inflicted by a knife or other sharp instrument and were consistent with a knife blade of eight to nine inches. Dr. Harlan testified that because the neck wound did not affect Angela Holmes's nervous system, she "would have had conscious control of her bodily functions, conscious movement, etc. for at least that period of time up to eighty percent of the amount of time it took her to die."

Dr. Harlan testified that Michelle Mace also received multiple stab wounds. In fact, Ms. Mace received fourteen stab wounds, but, like Ms. Holmes, the fatal incision was a stab wound to the neck. Dr. Harlan used a styrofoam ball to assist in illustrating to the jury the injuries Ms. Mace received to her head and neck. Dr. Harlan explained that the incision to Ms. Mace's neck was a compound incision that reached the backbone. The incision consisted of at least three different changes of direction, which resulted in five cuts to the vertebral column, three of which penetrated bone, with the deepest of those penetrating one quarter of an inch into the backbone. Dr. Harlan testified that the stab wound was consistent with a sawing motion. Michelle Mace also remained alive for five to fifteen minutes and remained conscious eighty percent of the time from infliction of the wound to death. In addition to the multiple stab wounds to her head and face, Michelle Mace also received a stab wound to her right shoulder that struck the shoulder blade.

Mitchell Roberts testified that he knew the defendant as a cook at Shoney's. He testified that appellant's employment with Shoney's ended in January or February 1997. He did not see appellant again until he showed up at his home unexpectedly in late May or June 1997 at approximately 9:00 or 10:00 p.m. Mr. Roberts accompanied appellant outside where he asked Roberts about getting his job back at Shoney's. Mr. Roberts told appellant that the decision was out of his hands. Subsequently, appellant told him that he wanted to show him something in his car. Mr. Roberts testified that he saw appellant in the possession of a knife with a blade approximately eight or nine inches long. Appellant was driving a small red car that may have been a Ford.

At trial, Tobaris Holmes identified the pants, shoes, socks, bra, and hair tie that Angela Holmes wore to work on April 23, 1997. Connie Black, Michelle Mace's mother identified the jeans, belt, shoes, hair bow, and socks Michelle wore to work the night of her disappearance. She also identified a t-shirt in a photograph as the shirt Michelle wore to work that night. Ms. Black told the jury that the last time she talked to her daughter was at 9:45 p.m. on April 23, 1997, when she discussed the arrangements for her to be picked up from work that evening.

## Sentencing phase

Tobaris Holmes testified that he was Angela Holmes's husband and that they were the parents of a daughter, Ryane. Ryane was an infant at the time Angela was killed. He testified that his wife's death made him feel that he did not perform in his duties as a husband and in protecting his family. His wife's death made him feel incomplete as if he was less than a man. Moreover, his daughter did not get the opportunity to know her mother and did not remember her.

Kim Campbell, Angela Holmes's mother, testified that their family of four children was very close. Ms. Campbell testified that the murder traumatized her youngest son, Chase, who was terrified that his sister Amy would be murdered. Following Angela's murder, they had to keep the lights on at night for Chase.

Craig Mace testified that he was not the same person since Michelle's death. He testified that he was angry, sad, and fearful. He stated that the murder "destroyed" his father.

Connie Black, Michelle Mace's mother, testified that she did not have her little girl anymore and felt like there was a void inside her. She testified that Kelly lost her best friend when Michelle was murdered, and Craig felt like he was not there to protect Michelle when he should have been.

Dr. Harlan testified again during the sentencing phase regarding the extent of the victim's injuries and the cause of death.

Tom Thurman, an assistant district attorney general in Davidson County, Tennessee, testified that he was the prosecuting attorney in the Captain D's murders. He testified that appellant was convicted of two counts of first degree murder and one count of especially aggravated robbery in Davidson County.

Brian Johnson, an assistant attorney general in Harris County, Texas, testified that appellant was convicted of aggravated robbery in 1984. The parties stipulated that this crime involved the use of violence to the person.

Dr. Xavier Amador testified on behalf of the defense. Dr. Amador testified that appellant suffered from paranoid schizophrenia, a cognitive disorder, and a personality change. He further explained, that in lay terms, appellant suffered from a "broken brain," which left him unable to control his impulses. He testified that appellant had documented head trauma. Dr. Amador told the jury of several childhood head injuries appellant received. He also described appellant's unstable family history and his behavioral problems as a child.

Dr. Amador interviewed appellant's family members, including his mother and sister. He explained that appellant believes he has been under continuous government surveillance since 1978 and that he is a test subject. He testified that appellant is reluctant to discuss his beliefs because he feels loyal to the government agency that selected him for the secret mission. Dr. Amador testified that appellant was diagnosed as having brain dysfunction as early as 1964 and 1966. Three Texas doctors found him to have a psychotic disorder in 1978, and another doctor gave a similar diagnosis in 1984. Appellant was prescribed an anti-psychotic medication and improved as a result. He did not become extremely sedated, which occurs to persons who take the medication and are not psychotic.

Dr. Amador admitted that, although appellant was evaluated as malingering mental illness on three different occasions, he believed that appellant claimed to be faking his mental illness

because of his tremendous desire to be normal. Dr. Amador concluded that appellant was not malingering at the present time.

Patricia Allen, a speech and language therapist at Vanderbilt Medical Center who treats persons with traumatic brain injuries, testified on behalf of the defense. She evaluated appellant for fifteen hours in 1998. She administered tests to determine appellant's ability to pay attention, remember, problem solve, and reason. She also relied upon appellant's medical and school records.

She testified that appellant was born with a deformed ear and hearing loss. She also explained that appellant's parents divorced when he was very young. His father was an alcoholic, so he sent appellant to live with his grandmother, but appellant was unable to follow her rules. Thereafter, he was surrendered to state custody. Subsequently, his mother claimed custody of him and changed his name. According to Ms. Allen, appellant's mother's household was marked by drug use and sexual abuse. Allen testified that appellant had received four head injuries. His family members noted that his behavior changed for the worse following each of the head injuries. She concluded that appellant's injuries occurred at ages when appellant should have had the greatest course of development. She further testified that appellant performed poorly on tests that measure language mastery and reasoning ability. She opined that these results are consistent with an individual who suffered a brain injury.

On cross-examination, Ms. Allen admitted that she did not conduct an independent investigation into appellant's background but relied upon information provided by the defense attorneys. She testified that appellant could understand normal everyday conversation and average directions, except if you asked him to do it again quickly. She believed that appellant knew it was wrong to kill people.

Dr. Pamela Auble, a neuropsychologist, testified that appellant suffered from abnormalities in his brain that affected his functioning, that appellant had evidence of psychotic symptoms, and that appellant suffered a very damaging childhood. These conclusions were based on her interview, evaluations, testing, and review of medical and social history. Dr. Auble testified that medical imaging of appellant's brain shows that his left temporal lobe is shrunken and distorted. Dr. Auble testified that studies show that persons with damage in the left temporal lobe may exhibit aggressive behavior and psychotic symptoms such as delusions. Dr. Auble testified that appellant has long-standing delusions of a government plot to control and kill him. She testified that his denials of this plot are the result of anosognosia, which she explained was a condition in which mentally ill persons go to pathological lengths to appear normal.

Dr. Auble testified that she saw no evidence of appellant malingering a mental illness. Instead, appellant attempted to portray himself as normal. Dr. Auble conducted tests to determine if appellant was malingering, and the tests did not show that he was faking his illness. Dr. Auble testified that appellant had a family history of mental illness and delusions, which is important because the risk of developing mental illness can run in families.

On cross-examination, Dr. Auble admitted that appellant admitted that he faked his belief that he was under government surveillance. She further admitted that she normally testifies on behalf of the defense in criminal cases.

Dr. Robert Kessler, a neuroradiologist, testified as the last defense witness at the sentencing hearing. Dr. Kessler performed magnetic resonance imaging (MRI) and positron emission tomography (PET) scans on appellant. Dr. Kessler opined that appellant suffered shrinkage and damage to the left temporal lobe of the brain, which was likely caused by a head trauma. Dr. Kessler testified that appellant appeared to have decreased brain function.

The State called Dr. William Bernet for rebuttal proof. Dr. Bernet is a forensic psychologist who evaluated appellant on three occasions. Dr. Bernet concluded that appellant suffered from antisocial personality disorder, which affects his thinking and behavior pattern, malingering, and paranoia that at times takes the form of delusions. He testified that appellant admitted to fabricating stories of being under government surveillance. He testified that appellant faked psychiatric illnesses, depending on the situation, for personal gain.

On cross-examination, Dr. Bernet admitted that there was no indication that appellant was malingering with regard to a current mental illness. Instead, he testified that appellant now had a problem with reverse malingering, where he pretends not to have a mental illness he in fact has. Dr. Bernet agreed that appellant was pretending to be mentally healthier than he actually was. Dr. Bernet also admitted that appellant told detectives Postiglione and Roland in an interview in June 1997 that they needed to know about the surveillance project because the surveillance tapes would reveal his true whereabouts on the day of the murders and provide an alibi for him. Dr. Bernet further admitted that appellant had written a letter to him in January 1999 in which he described three attempts by the government to take his life. Dr. Bernet admitted that appellant suffered from delusions but denied that appellant's brain damage had any connection with his criminal activity on April 23, 1997.

On re-direct examination, Dr. Bernet testified that appellant could have told the detectives that he was under government surveillance in an attempt to make them change their line of questioning. He explained that appellant may have perceived that distraction as a benefit to him.

## Analysis

### I. Validity of Search Warrants

Appellant contends the trial court erred in denying his motion to suppress evidence seized pursuant to search warrants 145, 146, and 189. Specifically, appellant argues that warrant 145, authorizing the search of his "red 1997 Ford Escort LX four door . . .[,]" and warrant 146, authorizing the search of his home located at 1424 Ordway Place, are invalid because they did not describe with particularity the items ultimately seized. Appellant further claims that the warrants are invalid for lack of probable cause due to the passage of time and that the warrants do not establish a nexus between the criminal activity and his home and the criminal activity and his car.

Appellant challenges warrant 189 on the grounds that he did not receive an exact copy of the warrant authorizing the police to obtain hair and blood samples from him and that the warrant lacked probable cause because it failed to state that the police obtained blood and hair samples from the victims to compare to his. Appellant raised these same allegations with regard to warrants 146 and 149 on his direct appeal of the Captain D's murders[3] and the Tennessee Supreme Court found these allegations to be without merit.[4] Reid, 91 S.W.3d at 273-76.

The Supreme Court set forth a detailed analysis examining the requirement of particularity for search warrants, the requirement of a nexus between the criminal activity and the area to be searched, and the requirement of Tennessee Rule of Criminal Procedure 41 that the serving officer leave a copy of the search warrant with the person on whom the search warrant is being served.

In discussing the particularity required for search warrants, the court stated:

> Under both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution a search warrant must contain a particular description of the items to be seized. See State v. Henning, 975 S.W.2d 290, 296 (Tenn.1998) (citing cases). This requirement serves as a limitation, both upon governmental intrusion into a citizen's privacy and property rights and upon the discretion of law enforcement officers conducting the search. Id. To satisfy the particularity requirement, a warrant "must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." Henning, 975 S.W.2d at 296 (internal quotations and citations omitted).

Reid, 91 S.W.3d at 273.

The court quoted with approval the following language from Lea v. State, 181 S.W.2d 351, 352-53 (1944), which sets forth the particularity requirement for search warrants.

> [W]here the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other. On the other hand, if the purpose be to seize not specified property, but any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be unnecessary, and ordinarily impossible.

Reid, 91 S.W.3d at 273-74.

_____

[3] The evidence seized from appellant's car and home and the samples taken from appellant's person, which were ultimately used in the trial at issue, were seized as a result of the investigation of the Captain D's murders in Nashville and were introduced as evidence in the Captain D's murder trial.

[4] On appeal of his convictions in the Captain D's murders, appellant did not challenge warrant 145, authorizing the search of his car, but the Supreme Court's analysis is equally applicable to warrant 145.

Applying the principles set forth in <u>Lea</u> to the warrants at issue in <u>Reid</u>, the court noted that

> [w]arrants 146 and 149 authorized searches of the defendant's residence for items "which may be identified" as property belonging to the victims or the restaurants, and any items that "may be used to cause the death of the victims." Warrant 149 additionally authorized a search for "any and all financial records to include those indicating" money paid by the defendant on an automobile lease around the time of the murders. An affidavit was attached to each warrant, setting forth the nature and circumstances of the crimes and noting several items that had been taken from the restaurants, including bank bags.

<u>Id.</u> at 274. Ultimately, the court affirmed the decisions of the trial court and this Court, which determined that the warrants met the particularity requirement because "the warrants described the character of the property with sufficient particularity 'to enable the searcher to reasonably ascertain and identify' the items subject to seizure." <u>Id.</u>

In response to appellant's arguments that the information in the affidavits accompanying the warrants was stale and there was no probable cause to believe that evidence of the crimes would be located at appellant's residence, the court examined the requirement that there be a nexus between the criminal activity and the area to be searched and found that

> To establish probable cause an affidavit must set forth facts from which a reasonable conclusion may be drawn that the evidence will be found in the place for which the warrant authorizes a search. <u>State v. Vann</u>, 976 S.W.2d 93, 105 (Tenn. 1998); <u>State v. Longstreet</u>, 619 S.W.2d 97, 99 (Tenn. 1981). In addition, the affidavit must contain information which will allow a magistrate to determine whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought. <u>Vann</u>, 976 S.W.2d at 105. While the lapse of time between the commission of a crime and the issuance of a search warrant may affect the likelihood that incriminating evidence will be found, probable cause is a case-by-case determination. <u>State v. Meeks</u>, 876 S.W.2d 121, 124 (Tenn.Crim.App.), perm. app. denied (Tenn. 1993). In making this determination, courts should consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct. Courts also should consider the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence. <u>State v. Dellinger</u>, 79 S.W.3d 458, 469-70 (Tenn. 2002); <u>State v. Smith</u>, 868 S.W.2d 561, 572 (Tenn.1993).

> . . . [T]he criminal conduct under investigation was not an isolated event. As indicated in the warrants, the crimes occurred almost one month apart, with the last crime committed on March 23, 1997, less than three months prior to the time the warrants were being sought. The warrants sought any items that had been taken from the restaurants or the victims or that may have been used to cause the death of the

victims. The affidavits set out the circumstances of the Captain D's and McDonald's robberies, including the fact that the only person who had survived the crimes had been repeatedly stabbed and left for dead. The affidavits further noted that the defendant's fingerprint had been recovered from an item belonging to one of the Captain D's victims, that the murder scenes were extremely bloody, that the victims' blood could be on the defendant's clothing, and that the defendant could still have in his possession or on his premises instruments of violence used to murder the victims or personal items belonging to the victims. Clearly, the affidavits provide an explanation for why the items sought by the warrants are capable of, and are in fact, likely to be hidden in the defendant's residence. . . . Where, as here, a perpetrator believes he has eliminated or incapacitated all witnesses so that law enforcement officials are unlikely to discover his criminal activity, it is neither unreasonable nor unlikely that the perpetrator would keep clothing, or the murder weapons, or items taken during the crime at his residence. See Smith, 868 S.W.2d at 572. Therefore, we conclude that the trial court and Court of Criminal Appeals correctly found that the affidavits set forth sufficient facts from which the magistrate reasonably could have concluded that a nexus existed between the crime and the place to be searched and that the facts were sufficiently recent to establish probable cause.

Reid, 91 S.W.3d at 275-76.

Appellant has not shown how the evidence preponderates against the trial court's findings in this case. "[T]he trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the application of the law to the facts as found by the trial court is a question of law, which the appellate court reviews de novo. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Appellant concedes that the Supreme Court held two of the search warrants at issue in this case valid in the Captain D's appeal but argues that this court should not follow the reasoning set forth by the Supreme Court because it misinterpreted and misapplied the principles set forth in Lea. Appellant argues that the less exacting particularity requirement set forth in Lea applies only when the property to be seized is of an illicit or illegal nature. Appellant contends that the danger in failing to abide by the Lea court's precise holding is that a more expansive interpretation of the case will result in the "general searches" prohibited by the state and federal constitutions. Appellant maintains that, because the warrants at issue do not comply with the requirements set forth in Lea, the warrants are constitutionally defective. This court, however, adopts the reasoning of the Supreme Court in Reid, 91 S.W.3d at 273-76, and determines that warrants 145 and 146 are valid.

Appellant contends that he did not receive a copy of warrant 189 at the time the warrant was executed in violation of Tennessee Rule of Criminal Procedure 41. In dismissing the identical issue with respect to warrant 149 in Reid, the Supreme Court found:

It is undisputed that the officers executing the warrants were aware of the defendant's whereabouts. It is also undisputed that the detectives left a copy of the search warrant locked inside the defendant's residence, from which the property was taken. The rule requires nothing more. . . . [T]here was no one present on whom the officers could serve the warrant at the time it was executed; therefore, <u>it was not possible</u> for the officers to leave a copy with the person being served. Rule 41(c) does not require officers to deliver a copy of the search warrant to a person who is not present. Instead, subsection (d) of Rule 41 indicates that an officer taking property under a warrant shall "give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken <u>or shall leave the copy and receipt at a place from which the property was taken</u>." (Emphasis added.) In this case, the officers left the warrant at the defendant's residence, the place from which the property was taken. This issue is without merit.

<u>Reid</u>, 91 S.W.3d at 276.

In pertinent part, Tennessee Rule of Criminal Procedure 41 provides: "[T]he failure of the serving officer <u>where possible to leave a copy with the person or persons on whom the search warrant is being served</u>, shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure." Tenn. R. Crim. P. 41 (emphasis added).

Detective Postiglione testified in a pretrial motion hearing that he and Detective Rolland served a copy of warrant 189 on appellant at the Sheriff's Department at the Davidson County Criminal Justice Center. The search warrant shows that it was executed and returned on the same date it was issued, August 6, 1997. Therefore, it appears that Tennessee Rule Criminal Procedure 41(c) was satisfied.

Appellant asserts as a final argument that warrant 189 lacked probable cause to permit seizure of appellant's hair and blood because the warrant failed to state hair and blood samples had been obtained from either of the victims or the crime scenes that could be used to compare to appellant's hair or blood. The warrant states, however, that "Paul Dennis Reid Jr. may have been cut or injured to the point where bleeding occurred, thus leaving his blood either on the victims or in the area [of] the crime scenes. It is also possible that during this contact Paul Dennis Reid Jr. left behind body hairs either on the victims or in the area of the crime scenes." Thus, the warrant provided an explanation for why the items sought may be found on appellant and set forth sufficient facts for a magistrate to reasonably conclude that a nexus existed between the crime and appellant's hair and blood. Based on the reasoning set forth by the Supreme Court in appellant's prior appeal of the Captain D's murders and the reasoning set forth above, this Court finds warrant 189 to be constitutionally valid. This issue is without merit.

## II. Crime Scene Video

Appellant contends that the trial court erred in admitting the videotape of the crime scene into evidence. Specifically, appellant contends that the videotape was not necessary to establish where the bodies were found or the extent of the victims's injuries because the videotape was merely cumulative of testimony of other witnesses. Appellant further contends that the depiction of the crime scene in the videotape was "gruesome and graphic" and, thus, prejudicial. Appellant submits that the only purpose of the video was to inflame and prejudice the jury against appellant.

The admissibility of a videotape of a crime scene is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. State v. Carruthers, 35 S.W.3d 516, 576-57 (Tenn. 2000), cert. denied, 533 U.S. 953 (2001); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); see also State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993), cert. denied, 511 U.S. 1046 (1994). As the Supreme Court stated in Carruthers, the modern trend is to vest more discretion in the trial judge's rulings on admissibility. Carruthers, 35 S.W.3d at 577 (citing Banks, 564 S.W.2d at 949; State v. Michael Carlton Bailey, No. 01C01-9403-CC-00105, 1995 WL 424996, at *7 (Tenn. Crim. App. at Nashville, July. 20, 1995), perm. to appeal denied, (Tenn. Jan. 8, 1996).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. Carruthers, 35 S.W.3d at 577 (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The court must still determine the relevance of the evidence and weigh its probative value against any undue prejudice. Id. The term "undue prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 950-51. In Banks, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. Id.

In this case, the trial court found that the video aided the jury in understanding the testimony of medical examiners, crime scene investigators, and witnesses. The trial court noted that the jury was from Memphis and presumably unfamiliar with the area and Dunbar Cave State Park. The trial court also found that the video depicted the location of the bodies and was shown to document the position of the bodies in relation to the lake, the trail described by investigators and witnesses, the parking lot, and the cave. The trial court determined that the video was not "particularly gruesome." Appellant advances the argument that the video was graphic and gruesome only because the video

shows the bodies of the victims as they were found at the crime scene. The crime scene video of most murders will necessarily depict the bodies of the victims as they were found. If this court were to accept appellant's argument in this regard, no crime scene videotapes of murders would ever be admissible.

This Court further concludes that while the videotape and the other evidence admitted in this case may have contained some of the same material, it was not error to admit the videotape. See Bigbee, 885 S.W.2d at 807 (holding that it was not error to admit a videotape of the crime scene although it depicted images similar to those of photographs also admitted). Each of the different forms of evidence admitted in this case served different purposes and were probative of the issues to be decided by the jury. As a result, the trial court did not abuse its discretion in admitting the videotape into evidence. See id.; see also State v. Kelvin Anthony Lee, No. 02C01-9603-CC-00085, 1997 WL 686258, at *9 (Tenn. Crim. App. at Jackson, Nov. 5, 1997), perm. to appeal denied, (Tenn. Aug. 3, 1998.) The probative value of the video of the crime scene is not outweighed by its prejudicial effect. This issue is without merit.

### III. Grand Jury Rough Notes

Appellant contends that the trial court erred by refusing to order the State to disclose grand jury testimony. In a pretrial motion, appellant asked the trial court to require disclosure of grand jury testimony, including notes taken by the Assistant Attorney General "for the purpose of ascertaining whether the witness' grand jury testimony is consistent with the testimony given by the witnesses before the court in the trial", at least to the extent that testimony was revealed in rough notes of the testimony taken by the assistant district attorney general. In the alternative, the motion sought for the court to review the notes in-camera to ascertain whether or not the witnesses' testimony was consistent with the testimony that the witnesses gave before the grand jury. The trial court granted appellant's motion to the extent the grand jury testimony was revealed in rough notes taken by the assistant attorney general but denied it as to the disclosure of grand jury testimony. The State responded that it did not possess any rough notes of the grand jury testimony.

On appeal, appellant relies on the exception to the rule of secrecy of grand jury testimony found in Tennessee Rule of Criminal Procedure 6(k)(2), which allows a member of the grand jury to be "required by the court to disclose the testimony of a witness examined before them, for the purpose of ascertaining whether it is consistent with that given by the witness before the court," to argue that the trial court should have ordered the State to disclose its rough notes of the grand jury testimony. Appellant argues that "[b]ecause the trial court's ruling allowed the State to take such an incredible position, . . . the court erred in so ruling." The rule does not require the district attorney's rough notes of grand jury testimony to be turned over to opposing counsel, the rule requires the disclosure of witness testimony for the purpose of ascertaining the consistency of the witness' testimony. Appellant has failed to show any error committed by the trial court. The appellant merely asked for the notes of the testimony that were taken by the prosecutor, and there were no actual allegations of inconsistencies in the grand jury testimony. Moreover, the State cannot produce documents it does not possess. This issue is without merit.

## IV. Limited Jury Questionnaire

Appellant argues that the trial court erred by denying his motion to disseminate a questionnaire to prospective jurors inquiring about the jurors' gender, birth date, educational background, and economic class. Specifically, appellant argues that the court's questionnaire did not cover the topics in sufficient detail to evaluate the representation of cognizable groups, relying upon Duren v. Missouri, 439 U.S. 357 (1979), which holds that a defendant has a right to challenge the venire to ensure adequate representation of cognizable groups.

Appellant fails to cite to the portion of the appellate record containing the questionnaire he requested be disseminated to the jury. Further, it does not appear that the questionnaire submitted to the jurors by the trial court was made a part of the appellate record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Ct. Crim. App. 10(b).

Moreover, the control of voir dire proceedings rests within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion unless clear abuse appears on the face of the record. State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993), cert. denied, 510 U.S. 1215 (1994). Furthermore, a trial judge has a right to participate in voir dire examination. Tenn. R. Crim. P. 24(a). Tennessee Rule of Criminal Procedure 24(a) provides: "The court may put to the respective jurors appropriate questions regarding their qualifications to serve as jurors in the case. . . ." The trial court found that its juror questionnaire covered the topics sufficiently. Appellant has failed to show that the inquiries made by the trial court were improper or inadequate and has failed to show any abuse of discretion by the trial court. Thus, this issue is without merit.

## V. Information on Past Performance of Prospective Jurors

Appellant contends that the trial court erred in denying his motion requiring the State to produce any information it had with regard to the past performance of prospective jurors. Appellant argued that he did not have the funds to hire an investigator to discover this information. The trial court denied the motion and ruled that such information could be found in the juror questionnaire and developed through voir dire. Appellant contends on appeal that the trial court's ruling violated his right to a jury trial found in Article I, Section 9 of the Tennessee Constitution and violated his due process rights found in the federal and state constitutions. Moreover, appellant contends that the court's questionnaire did not adequately address this issue and that voir dire is an insufficient tool because of the possibility of false statement or faulty memory as to past service.

Appellant fails to cite to the portion of the appellate record containing the questionnaire he challenges with respect to this issue. Further, it does not appear that the questionnaire submitted to the jurors by the trial court was made a part of the appellate record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Ct. Crim. App. 10(b). Appellant's brief and the appellate record are devoid of any evidence that appellant was prejudiced by the trial court's failure to require the State to

provide appellant with information regarding the past performance of prospective jurors. This issue is without merit.

### VI. Constitutionality of Tennessee Code Annotated Section 22-1-102

Appellant challenges two subsections of Tennessee Code Annotated section 22-1-102, which deem certain persons incompetent to act as jurors. Specifically, appellant contends that the statute is unconstitutional to the extent it excludes persons who have been convicted of certain infamous offenses, persons of unsound mind, and habitual drunkards. Tenn. Code Ann. § 22-1-102(a)(1), (4).

In making his argument, appellant notes that jury service is a right secured to all citizens under the federal and state constitutions. Georgia v. McCollum, 505 U.S. 42, 48-50 (1992); Wolf v. Sundquist, 955 S.W.2d 626, 633 (Tenn. Ct. App. 1997). He argues that Tennessee Code Annotated section 22-1-102 is overly broad in excluding all felons from jury service when some felons have rehabilitated themselves to the extent they could serve impartially on a jury. He further contends that the statute is overly broad in excluding "habitual drunkards" from serving on juries as some functional alcoholics are capable of serving in an impartial and attentive manner so long as they are not under the influence of alcohol at the time of trial. Finally, appellant contends that the statute is vague as it relates to persons of "unsound mind." Appellant argues that there is no accepted definition of unsound mind in the psychiatric or psychological community. Appellant contends that because the term can mean anything the court wants it to mean, it is void for vagueness.

As the State noted in its brief, the United States Supreme Court has held that states are "free to prescribe qualifications for [their] jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." Taylor v. Louisiana, 419 U.S. 522, 538 (1975). There is no evidence that the operation of this statute violates the fair cross-section requirement of the Sixth Amendment. This issue is without merit.

### VII. Exclusion of Jurors Based on Religion

Appellant filed a pretrial motion to prevent prospective jurors who stated that they could not impose the death penalty due to their religious convictions from being excluded from the jury. Appellant contends that the trial court erred in denying his motion to prevent exclusion of prospective jurors because of their religion. Appellant argues that the exclusion of jurors who claim that they cannot impose the death penalty due to their religious convictions violates the Tennessee Constitution, which provides that "no political or religious test shall ever be required as a qualification for jurors." The trial court denied appellant's motion, stating that it would use the tests formulated in Witherspoon v. Illinois, 391 U.S. 510 (1968) and Wainwright v. Witt, 469 U.S. 412 (1985) to determine juror qualification.

Appellant raised this issue in the appeal of his conviction for the Captain D's murders. The Tennessee Supreme Court ultimately held that the exclusion of prospective jurors by a trial court because of their moral or religious based reluctance to impose the death penalty is not error. Reid, 91 S.W.3d at 289-90. "In this regard, potential jurors are removed for cause not because of their religious opinion or affiliation but because the jurors are unable to view the proceedings impartially and perform their duties in accordance with the juror's oath." Id. at 290. Questioning of a juror with regard to the death penalty does not amount to a religious test. Id. (citing Wolf, 955 S.W.2d at 631.) Appellant acknowledges that the Tennessee Supreme Court has rejected this argument but makes the argument in order to preserve it for later review. Accordingly, this issue is without merit.

## VIII. Exclusion of Jurors who Were not "Death Qualified"

Pretrial, appellant moved the court to refrain from excluding jurors for cause based on their opposition to the imposition of the death penalty because the exclusion of jurors who are not "death qualified" under Witherspoon and Wainwright denied him a constitutional right to have an impartial jury composed of a fair cross-section of the community. Appellant acknowledges the Tennessee Supreme Court has rejected this argument but asserts it in order to preserve later review. Accordingly, this argument is without merit.

## IX. Separate Juries on Issues of Guilt and Sentencing

Appellant moved the trial court to have one jury determine his guilt or innocence and a second jury to determine his sentence, which the trial court denied. On appeal, appellant asserts that separate juries are necessary to ensure his right to a fair trial under the Tennessee and federal constitutions. This argument was rejected by our supreme court in State v. Dellinger, 79 S.W.3d 458, 478-79 (Tenn. 2002), which appellant acknowledges. Appellant asserts this issue in order to preserve it for later review. This issue is without merit.

## X. Constitutionality of Tennessee Code Annotated Section 39-13-204(h)

Appellant moved the trial court to declare Tennessee Code Annotated section 39-13-204(h) unconstitutional, arguing that prohibiting the trial court from informing the jury as to the effect of a nonunanimous verdict in the sentencing phase violates his state and federal constitutional rights to a fair trial. Appellant acknowledges that this argument was rejected by the Tennessee Supreme Court in State v. Hall, 958 S.W.2d 679, 718 (Tenn. 1997), but asserts the issue in order to preserve it for later review. Accordingly, this issue is without merit.

## XI. Constitutionality of Death Penalty

Appellant contends that the death penalty statute is unconstitutional because it constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution. Appellant concedes that this argument was rejected by the supreme court in Hall, 958 S.W.2d at

718, but asserts this issue in order to preserve it for later review.  Accordingly, this issue is without merit.

## XII.  Constitutionality of Tennessee Code Annotated Sections 39-13-204 and 39-13-206

Appellant contends that Tennessee's death penalty statutes are unconstitutional.  However, he fails to present any constitutional challenges to the death penalty statutes that have not been previously reviewed and rejected.

Appellant relies upon the case of United States v. Fell, 217 F. Supp. 2d 469 (D.Vt. 2002), in arguing that Tennessee's capital sentencing scheme, particularly Tennessee Code Annotated section 39-13-204(c), is unconstitutional because it allows the death penalty to be imposed based on evidence that is not subject to the guarantees of reliability and trustworthiness required by the due process and confrontation clauses of the federal constitution.  This Court rejected that argument in State v. Gdongalay Berry, No. M2001-02023-CCA-R3-DD, 2003 WL 1855099, at *7 (Tenn. Crim. App. at Nashville, Apr. 10, 2003) (holding that Tennessee's sentencing scheme, including Tennessee Code Annotated section 39-13-204(c), is constitutional).  Appellant argues, however, that the Berry court erred in finding Tennessee's sentencing scheme constitutional.  Specifically, appellant contends that the court erred by rejecting the analysis of the Fell court and adopting the reasoning of United States v. Matthews, 246 F. Supp. 2d 137 (N.D.N.Y. 2002).   Appellant maintains that both Matthews and Berry ignore a central theme in United States Supreme Court jurisprudence: that because death is a unique punishment in terms of its irrevocability, it requires more rigorous and scrupulous procedures than other criminal matters to ensure maximum reliability.  Further, appellant contends that because the Tennessee sentencing scheme does not contain a provision analogous to Federal Rule of Evidence 403, allowing the trial court to exclude evidence if its prejudicial effect outweighs its probative value, the trial court must admit any evidence that is "relevant" or "probative" to the issue of punishment, regardless of whether the evidence is reliable or more prejudicial than probative.  Accordingly, appellant contends that the Berry court erred in upholding the constitutionality of  Tennessee Code Annotated section 39-13-204(c) and urges this court to dispense with the Berry opinion, find the statute unconstitutional, and reverse this case.

The death penalty statutes have repeatedly been held constitutional.  See e.g., State v. Keen, 31 S.W.3d 196, 233 (Tenn. 2000), cert. denied, 532 U.S. 907 (2001); State v. Nesbit, 978 S.W.2d 872, 902 (Tenn. 1998), cert. denied, 526 U.S. 1052 (1999); State v. Vann, 976 S.W.2d 93, 117 (Tenn. 1998), cert. denied, 526 U.S. 1071 (1999); State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997), cert. denied, 523 U.S. 1083 (1998);  Bigbee, 885 S.W.2d at 813-14; State v. Smith, 857 S.W.2d 1, 21-22 (Tenn. 1993), cert. denied, 510 U.S. 996 (1993); State v. Bane, 853 S.W.2d 483, 488 (Tenn. 1993); see also Berry, 2003 WL 1855099, at *4-*5.

## XIII. Failure to Dismiss Indictment Pursuant to Article I, Section 19 of Tennessee Constitution

Appellant contends that the trial court erred in denying his motion to dismiss the indictment based upon its violation of Article I, Section 19 of the Tennessee Constitution. Appellant acknowledges that the supreme court rejected this argument in Van Tran, 864 S.W.2d at 481, but asserts the issue on appeal to preserve it for later review. Accordingly, this issue is without merit.

## XIV. Failure to Dismiss Indictment Because Aggravating Factors not Listed in Indictment

Next, appellant contends that because the indictment returned against him did not set forth the statutory aggravating circumstances relied upon by the State in charging him with a capital offense, the indictment is faulty and must be dismissed. In making his argument, appellant relies on Ring v. Arizona, 536 U.S. 584 (2002), Apprendi v. New Jersey, 530 U.S. 466 (2000), and several lower federal court cases interpreting Apprendi and Ring. The Tennessee Supreme Court has determined that the principles of Apprendi do not apply to Tennessee's capital sentencing scheme. See State v. Dellinger, 79 S.W.3d 458 (Tenn. 2002), cert. denied, 537 U.S. 1090 (2002). Further, this Court has held that neither Apprendi nor Ring apply to Tennessee's capital sentencing scheme. See Berry, 2003 WL 1855099, at *6-*7. Appellant bases his argument in part on Fell, 217 F. Supp. 2d at 484. Federal district court decisions do not bind this Court. The United States Supreme Court is the only federal court Tennessee courts are bound to follow. Thompson v. State, 958 S.W.2d 156, 174 (Tenn. Crim. App. 1997); State v. Bowers, 673 S.W.2d 887, 889 (Tenn. Crim. App. 1984). Appellant's arguments have been rejected by the Supreme Court in Dellinger and by this Court in Berry. This Court has stated on more than one occasion that Ring does not affect the supreme court's decision in Dellinger. See e.g., State v. Robert Faulkner, No. W2001-02614-CCA-R3-DD, 2003 WL 22220341, at *29 (Tenn. Crim. App. at Jackson, Sept. 26, 2003); Berry, 2003 WL 1855099, at *5 (Tenn. Crim. App. at Nashville, Apr. 10, 2003); State v. Richard Odom, No. W2000-02301-CCA-R3-DD, 2002 WL 31322532, at *13 n.1 (Tenn. Crim. App. at Jackson, Oct. 15, 2002). The cases from this Court rely on footnote 6 from Ring, which states, "[o]f the 38 States with capital punishment, 29 generally commit sentencing decisions to juries. See . . . Tenn. Code Ann. § 39-13-204." Ring, 536 U.S. at 608 n.6. As we have previously stated, because sentencing decisions in capital cases are submitted to the jury instead of decided by a trial judge, the Supreme Court's decision in Ring does not affect the Tennessee Supreme Court's holding in Dellinger. Robert Faulkner, 2003 WL 22220341 at *29; Gdongalay P. Berry, 2003 WL 1855099 at *5; Richard Odom, 2002 WL 31322532 at *13 n.1. Although appellant submits that Dellinger was "wrongly decided" and urges this court to reject the precedent set forth in that case, we decline to do so.[5] Accordingly, this issue is without merit.

---

[5]Appellant bases his argument in part on the fact that our supreme court's decision in Dellinger was called into question because Dellinger relied in part on Walton v. Arizona, 110 U.S. 3047 (1990), which was overruled by Ring. However, the United States Supreme Court denied certiorari in Dellinger in December of 2002, and our supreme court has not yet overruled Dellinger.

## XV.  Failure to Allow Defendant to Address the Jury Last

Appellant contends that the trial court erred in failing to allow him to address the jury last during closing arguments in the penalty phase of the trial.  This issue has been rejected by our supreme court. Smith, 857 S.W.2d at 24.  This issue is without merit.

## XVI.  Reliability of DNA Testing

Appellant contends that the trial court erred in denying his motion for a pretrial hearing to determine the reliability of the polymerase chain reaction ("PCR") DNA testing used in this case, pursuant to McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn. 1997).   In McDaniel, the Supreme Court clarified the standards for the admission of scientific evidence under Tennessee Rules of Evidence 702 and 703.  Subsequently, the Tennessee Supreme Court held that pursuant to Tennessee Code Annotated section 24-7-117, mitochondrial DNA evidence met the general standards for admission of scientific or technical evidence and could be allowed as a method of proving identification without expert testimony as to its reliability.  State v. Scott, 33 S.W.3d 746, 756-60 (Tenn. 2000).  The trial court herein relied on Scott and ruled that a pretrial hearing to determine the reliability of the DNA testing was not necessary.  Appellant argues that, although Scott held that a McDaniel hearing did not have to be conducted as to mitochondrial DNA testing, this case involves PCR DNA testing rather than mitochondrial DNA testing.  Appellant further contends that, "[b]ecause the scientific reliability of the specific type of testing used in this case has never been established, the trial court erred in failing to order a Daniel [sic] hearing."

The Tennessee Supreme Court has held "the PCR method of DNA analysis an inherently trustworthy and reliable method of identification."  State v. Begley, 956 S.W.2d 471, 477 (Tenn. 1997).  In Begley, the court held:

> [h]ereafter, the PCR method of DNA analysis shall be admissible into evidence without antecedent expert testimony as to its trustworthiness and reliability, pursuant to Tenn. Code Ann. § 24-7-117(b)(1).  As provided by that statute, parties are nevertheless allowed to offer proof that DNA analysis is not trustworthy and reliable. Tenn. Code Ann. § 24-7-117(b)(2). For example, a party can challenge the reliability of a particular test in any given case by a showing of sloppy handling of samples, failure to train the personnel performing the testing, failure to follow protocol, and the like. Such a challenge, however, will go to the weight, not the admissibility, of DNA evidence.

Id. at 478 (footnote omitted).  Herein, PCR DNA testing was utilized by the TBI and LabCorp expert witnesses.  In accordance with Begley, we conclude that the PCR DNA evidence was admissible without antecedent expert witness testimony as to its trustworthiness and reliability.  Accordingly, this issue is without merit.

## XVII.  Admission of Victim Impact Evidence

Appellant contends that the trial court erred in denying his motions to exclude all victim impact evidence and challenges the victim impact jury instruction in State v. Nesbit, 978 S.W.2d 872, 892 (Tenn. 1998).  Specifically, appellant argues victim impact testimony is prejudicial and irrelevant under the capital sentencing structure established by Tennessee Code Annotated section 39-13-204(g)(1) and Nesbit, 978 S.W.2d at 892, and should be excluded.  Appellant asserts that Tennessee Code Annotated section 39-13-204(g)(1) mandates that a jury "shall" return a verdict of death once a jury decides that aggravating circumstances exist and they outweigh any mitigating circumstances.  Appellant asserts that, under Nesbit, the jury is not permitted to consider the victim impact evidence until after finding that at least one aggravating circumstance exists and that the aggravating circumstance(s) outweigh any mitigating circumstances beyond a reasonable doubt.

Appellant also argues that the Nesbit jury instruction is illogical.  The instruction reads as follows:

> You may consider the victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance(s) found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.

Nesbit, 978 S.W.2d at 892.

Appellant contends that the jury charge in effect "moots" the victim impact evidence because Tennessee Code Annotated section 39-13-204(g)(1) requires the jury to return a verdict of death if it finds that an aggravating circumstance or circumstances exist beyond a reasonable doubt and outweigh any mitigating circumstances beyond a reasonable doubt.

Victim impact evidence has been declared constitutional by the United States Supreme Court and the Tennessee Supreme Court.  Payne v. Tennessee, 501 U.S. 808, 827 (1991); Nesbit, 978 S.W.2d at 889.  Furthermore, the argument advanced by appellant that victim impact testimony is irrelevant and should be excluded under Tennessee's current capital sentencing system, has also been rejected by the Tennessee Supreme Court.  See Reid, 91 S.W.3d at 282-83 (holding that any contradiction between the statute and the Nesbit instruction inures to the benefit of the defendant; therefore, this argument does not entitle the defendant to relief).  This issue is without merit.

## XVIII.  Amendment of Indictment

Appellant argues that the trial court erred in allowing the State to amend the indictment. The original indictment in this case charged appellant with two counts of premeditated first degree

murder, two counts of first degree felony murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery. On September 3, 1999, approximately a week before the trial began, the State moved to amend the indictment by deleting the words "especially aggravated" from counts 2 and 4 to reflect that appellant committed felony murder in each count in the perpetration of robbery. In essence, the State moved to amend the indictment to charge robbery rather than especially aggravated robbery as the underlying felony. The trial court granted the motion to amend the indictment, finding that the amendment was permitted under Tennessee Rule of Criminal Procedure 7(b).

The trial court has the discretion to grant or deny a motion to amend an indictment, and this court will alter such a ruling only where that discretion has been abused. State v. Kirkland, 696 S.W.2d 544, 545 (Tenn. Crim. App. 1985). Tennessee Rule of Criminal Procedure 7(b) reads: "An indictment, presentment or information may be amended in all cases with the consent of the defendant. If no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced, the court may permit an amendment without the defendant's consent before jeopardy attaches."

The trial court found that jeopardy had not attached and the amendment would neither subject appellant to prosecution for additional or different offenses than those alleged in the former indictment.

Appellant contends that because felony murder had been charged, the underlying offense is of "crucial importance." Specifically, he argues that the amendment charged an additional or different offense because the amendment relieved the State of the "burden of proving that [appellant] used a weapon and caused serious bodily injury to the victims at Baskin-Robbins - the only place where there is any evidence that a theft occurred" and required the State to prove merely that the appellant committed theft by violence or putting a person in fear. In other words, he argues that the requirement of proof of a weapon and infliction of serious bodily injury was eliminated by the amended indictment. Therefore, appellant contends that "it is clear that by amending the indictment to provide for simple robbery as the underlying felony, [appellant] was charged with a 'different' offense under Tenn. R. Crim. P. 7(b)."

Moreover, appellant contends that charging a different offense in the amended indictment gave rise to prejudice. Appellant submits that under the original indictment, he knew that he could not be convicted of felony murder unless the State could show that he entered the ice cream store, used a weapon to accomplish the theft, and then inflicted serious bodily injury on the victims either immediately or very shortly thereafter. After the amendment, he could no longer rely on this assumption, which in turn prejudiced him. The State argues that appellant has failed to show any prejudice.

The State contends that robbery is a lesser included offense of especially aggravated robbery. State v. Locke, 90 S.W.3d 663, 673 (Tenn. 2002). Therefore, the amendment did not substitute a

different or new predicate felony for the felony murder counts but instead simply charged a lesser-included offense of the predicate felony. We agree.

Moreover, after a review of the record, this court has determined that there is no showing that the amendment acted to prejudice appellant. The jury convicted appellant of two counts of premeditated murder in addition to the two counts of felony murder. The felony murder convictions were merged into the premeditated murder convictions. The evidence is sufficient to support the convictions as set forth infra. Therefore, any error in allowing the amendment is at most harmless.

## XIX. Failure to Consolidate This Case with Davidson County Cases

On August 13, 1998, appellant filed a motion to consolidate this case with the two pending cases in Davidson County pursuant to Tennessee Rules of Criminal Procedure 13(a) and 8(b). The trial court found that while consolidation was legally permissible under Tennessee Rules of Criminal Procedure 8 and 13, it was not appropriate under the facts of this case.

Tennessee Rule of Criminal Procedure 8(b) provides for permissive joinder if the "offenses constitute parts of a common scheme or plan or if they are of the same or similar character." The trial court issued a well-reasoned memorandum, finding that joinder was not appropriate under Tennessee Rule of Criminal Procedure 8(b) because it did not have sufficient evidence to support the theory that the offenses involved constituted a common scheme or plan. The court found that it had insufficient facts to establish that the modus operandi in the Davidson County incidents was probative of appellant's identity in the Montgomery County incident. The trial court noted that the perpetrator in the Montgomery County incident removed the victims from the scene and killed them by cutting their throats with a knife, whereas the Davidson County perpetrator shot the majority of the victims at the two crime scenes. Therefore, the court concluded that it could not find that there was a unique method used in committing the crimes as required by State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995). The trial court also found that although some of the witnesses would testify in the trials of all three offenses, many of the witnesses were necessary for only one of the trials. The trial court then reasoned that "capital trials are very lengthy and very complicated. A jury in this type of case is required to absorb, process, and evaluate a great deal of information. Given the limited factual similarities among the cases, consolidating them would create an unnecessary and, arguably, unmanageable burden on the jury." The court's memorandum on the issue of the factual appropriateness of consolidation spans five pages with citations to case law and the Rules of Criminal Procedure. Thus, appellant mischaracterized the trial court's decision on consolidation by stating that it "gave no specific reason for its decision, simply explaining that the decision of whether to order consolidation is in the court's discretion."

Permissive joinder pursuant to Rule 8(b) of the Tennessee Rules of Criminal Procedure is governed by an abuse of discretion standard, and a trial court's decision to consolidate offenses will not be reversed unless the court applied an incorrect legal standard or reached a decision which is against logic or reasoning that caused an injustice to the party complaining. Spicer v. State, 12 S.W.3d 438, 442-43 (Tenn. 2000).

Appellant asserts that he was prejudiced by the court's decision not to consolidate. He asserts that "if the jury had been able to hear the details of the other, similar murders it might well have afforded the expert proof regarding Defendant's well-documented mental illnesses more credence." After a review of the record on this issue, this Court cannot conclude that the trial court abused its discretion in denying appellant's motion to consolidate. This issue is without merit.

## XX.  Competency of Appellant to Stand Trial

The test for determining whether a defendant is competent to stand trial is whether the defendant has "the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." State v. Black, 815 S.W.2d 166, 173-74 (Tenn. 1991); Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975); see also Dusky v. United States, 362 U.S. 402-03 (1960).  "The burden is on the defendant to establish his incompetency to stand trial by a preponderance of the evidence."[6] State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); see also Cooper v. Oklahoma, 517 U.S. 348, 355 (1996) (holding that criminal defendants may be required to prove their incompetency to stand trial by a preponderance of the evidence but not by clear and convincing evidence); Jordan v. State, 135 S.W. 327 (Tenn. 1911) (finding no error in the trial court's jury charge referencing the presumption of sanity[7] until rebutted and overturned).  Furthermore, the "findings of the trial court are conclusive on appeal unless the evidence preponderates otherwise." Oody, 823 S.W.2d at 559 (citing Graves v. State, 512 S.W.2d 603 (Tenn. Crim. App. 1973)).

This case presents a classic battle of the experts.  The defense experts, Dr. Pamela Auble and Dr. Xavier Amador, testified that appellant was not competent to stand trial, whereas the State's expert, Dr. William Bernet, and the independent expert appointed by the trial court, Dr. Cynthia Turner-Graham, found appellant competent to stand trial.

Dr. Auble testified that appellant suffered from delusions.  She explained that she first began to question appellant's competency following appellant's convictions in the Captain D's murders because appellant abruptly decided not to present mitigating proof at the sentencing hearing.  Dr. Auble admitted that appellant eventually agreed that his counsel could present mitigating proof, and the same was presented on his behalf.  During this time, appellant advised her that he believed the government had attempted to kill him on three occasions, the last of which was the government's

---

[6]The issue of which party bears the burden of proof at a competency hearing is in dispute in this case.  Appellant contends that the State bears the burden of proving that a defendant is competent to stand trial.  To support this argument, appellant cites to Black, 815 S.W.2d at 174.  However, a review of Black reveals that the supreme court merely quotes a jury instruction by a trial court, which stated that the State bore the burden of proof to prove competency to stand trial once the issue of competency was asserted, rather than affirmatively adopting this standard as binding precedent in Tennessee.  This issue is analyzed in more detail infra.

[7]At the time Jordan was decided, the term present insanity was used rather than competency.  The test for present insanity was whether the defendant was of sufficient mental capacity to give sane advice to his counsel involving the charge in the indictment.  Jordan, 135 S.W. at 328.  The jury charge in Jordan related to the issue of competency to stand trial as opposed to insanity at the time of the offense.

framing of him for the Captain D's murders. Dr. Auble opined that appellant's government surveillance delusions interfered with his rational understanding of the charges against him in this case. Therefore, she believed that appellant was unable to appraise the outcome of the proceedings, could not make decisions, and was unable to assist with his defense. She further explained that appellant suffered from anosognosia, which also interfered with his rational understanding of his case. She acknowledged that appellant understood courtroom procedure and had a "superficial" understanding of courtroom activities. She also admitted that appellant was previously diagnosed with malingering but denied that he was currently malingering. She testified that appellant's answers on the Minnesota Multi-Phasic Personality Inventory (MMPI) did not indicate malingering.

Dr. Xavier Amador also testified that appellant was incompetent to stand trial. Dr. Amador testified that he met with appellant on several occasions and performed twenty hours of clinical interviews. He concluded that appellant was competent to stand trial in January 1999, despite the fact that he suffered from delusions and anosognosia. However, following that time, appellant began to incorporate the people assisting in his defense into his delusions. Dr. Amador concluded that appellant suffered from schizophrenia and anosognosia, which combined to render him unable to assist his counsel. Dr. Amador testified that appellant's schizophrenia and resulting delusional beliefs destroyed his understanding of the legal process and caused him to believe that his own attorneys worked to convict him. The anosognosia also affected his ability to assist in his defense because he did not want to discuss any aspect of his case that he believed would reveal his mental illnesses. Dr. Amador agreed with the other experts that appellant had a factual understanding of the legal proceedings, but he did not believe that appellant had a rational understanding of the proceedings. Dr. Amador did not believe appellant was malingering.

Dr. William Bernet testified on behalf of the State. Dr. Bernet testified that he evaluated appellant on three occasions. It was Dr. Bernet's opinion that appellant understood the legal process and the possible penalties. He further believed that appellant was able to cooperate and communicate with his attorneys. Appellant was able to explain the correct understanding of the Fifth Amendment privilege against self-incrimination and correctly explained the possible outcomes of the trial and the penalties he faced. Further, appellant understood the role of his attorneys and discussed with them plea bargains, trial strategy, witnesses, DNA evidence, and an alibi defense. Appellant told Dr. Bernet that he understood the two phases of the trial and discussed possible mitigation evidence. Dr. Bernet concluded that appellant suffered from an antisocial disorder and delusional paranoia but malingered. He testified that, despite appellant's mental problems, he was competent to stand trial.

Dr. Cynthia Turner-Graham testified as an independent expert appointed by the court. Dr. Turner-Graham interviewed appellant once, just prior to the competency hearing. As a result of her interview, she concluded that appellant was competent to stand trial. Dr. Turner-Graham testified that appellant understood the nature of the legal process, the charges pending against him, and the potential consequences. She further testified that appellant could advise counsel and participate in his own defense. Appellant understood that he was indicted on two counts of murder, but maintained his innocence. He believed that a successful defense could be established by presenting

an alibi defense and disputing DNA and fiber evidence. She determined that he worked with his attorneys but, at times, disagreed about the best approach to take with his defense. Appellant admitted to her that he had malingered psychiatric symptoms in the past to minimize punishment during earlier legal proceedings. Appellant understood courtroom procedure and the roles of the players in the courtroom. She concluded that appellant suffered from antisocial personality disorder and malingered when it was "expedient given the realities of the current situation," but was "clearly competent to stand trial."

Following the proof, the trial court found that appellant suffered from a brain injury and had other physical conditions that caused him difficulty in learning to behave appropriately in certain situations. The trial court found that, although this made it somewhat difficult for appellant to communicate with his attorneys, it did not rise to the level of incompetence. The court accredited the testimony of the State's witness and the court-appointed expert. The trial court found the testimony of the defense experts to be inconsistent in that they found that appellant believed that everyone was controlled and had no free will but, at the same time, acknowledged that appellant disagreed with his attorneys about his defense. The trial court found that the evidence showed that appellant assisted his attorneys in a meaningful way by suggesting rational legal theories. The trial court concluded that appellant had a rational understanding of the proceedings and the participants and was capable of cooperating with his attorneys, when he chose to do so, and he was, therefore, competent to stand trial. The trial court noted that, because there was a dispute as to which party bore the burden of proof at the hearing, the court evaluated the proof under both standards and concluded that appellant was competent under each standard.

On appeal, appellant contends that the trial court's finding that the defense experts were inconsistent is erroneous. Appellant contends that the trial court's findings that Dr. Amador's testimony was inconsistent reflects a "serious misunderstanding of Dr. Amador's testimony." Likewise, appellant contends that the trial court's findings that Dr. Auble's testimony was inconsistent reflects a "fundamental misunderstanding of the expert proof." Appellant further asserts that the trial court's finding that the State's expert and the court-appointed expert were more credible is erroneous. When a trial court conducts a hearing, it has the opportunity to see and hear the witnesses and their conflicting testimony. The trial court's findings have the weight of a jury verdict on appeal. State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981).

After a review of the record, we cannot conclude that the trial court's determination that appellant was competent to stand trial was erroneous. The trial court's findings are supported by ample evidence. The trial court did not abuse its discretion. Accordingly, this issue is without merit.


## XXI. and XXII.  Testimony of Rev. Joe Ingle, Mary Ann Hea, and Ron Lax at Competency Hearing

At the competency hearing, appellant sought to introduce the testimony of Reverend Joe Ingle, Mary Ann Hea, and Ron Lax. He asserts that these three witnesses would have testified as to

appellant's incompetency to stand trial. Appellant contends that the information possessed by these witnesses is absolutely critical to a fair determination of his competency to stand trial. Rev. Ingle was not allowed to testify because appellant refused to waive the priest/parishoner privilege. Defense counsel withdrew witnesses Hea and Lax because the court ruled that it would permit "wide open" cross-examination as to each of these witnesses on matters relevant to competency, even though defense counsel requested that the cross-examination of these witnesses be limited because they each worked with appellant's "defense team" in connection with appellant's Davidson County cases. The court determined that because these witnesses were part of appellant's defense team, appellant would be required to waive the attorney/client privilege. Appellant refused to waive his privileges.

Rev. Joe Ingle, appellant's minister, was prepared to testify that he had visited and counseled hundreds of mentally ill prisoners over the past twenty-five years, and appellant was the most mentally ill prisoner he had ever counseled. Rev. Ingle had spent more time with appellant than all of the expert witnesses combined. Appellant contends that, although Rev. Ingle is not a trained psychiatrist or psychologist, his lay perceptions of appellant mirror those offered by Drs. Auble and Amador, which is "highly significant." In the affidavit offered by Rev. Ingle, he states that appellant is obsessed with the desire to be normal. When he was able to break through appellant's "mask of normalcy" and get him to reveal his true thoughts, he found appellant's thinking bizarre and delusional. Appellant advised Rev. Ingle that he is being "set up" by the government. Appellant further contends that Rev. Ingle's testimony would have provided a disinterested perspective on his mental health that could have rehabilitated the defense experts.

Mary Ann Hea is a social worker employed by the Davidson County Public Defender's Office. Hea would have testified to the substance of her many interviews with appellant. The trial court held that because Hea was employed by the public defender's office, she stood in the same position as an attorney. Thereafter, defense counsel excused Ms. Hea as a witness.

Appellant also sought to call Ron Lax as a witness at the competency hearing. Mr. Lax is a defense investigator involved in appellant's McDonald's murders case in Davidson County. The defense sought to question Lax based upon two interviews with appellant during June 1999, and counsel requested that the court limit the State's cross-examination of Lax to these two interviews. The trial court denied the request, ruling that on cross-examination the State would be entitled to ask Lax about all of the interviews he had conducted with appellant, and the State would be able to discover all of Lax's reports of these interviews as Jenks material. As a result, the defense did not offer Lax as a witness.

Appellant acknowledges that Tennessee follows the "wide-open" approach to cross-examination but argues that cross-examination is limited to questions that are designed to elicit relevant evidence. See State v. Adkisson, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994). Appellant asserts that because the defense experts testified that appellant was competent to stand trial until the late spring or early summer 1999, appellant's competency to that point was not at issue, and the State should have been limited to questioning Lax as to his interviews of appellant following the

appellant's "deteriorated state" only. Otherwise, the trial court was authorizing the State to "delve into wholly irrelevant matters in its cross-examination." The State counters that it should have been provided the opportunity to cross-examine the witness with regard to his conversations and interactions with the appellant touching on his competency and incompetency.

Tennessee Rule of Evidence 611(b) provides that the scope of cross-examination extends to "any matter relevant to any issue in the case, including credibility." Because appellant's competency was at issue, conversations and interactions Lax had with appellant prior to his determination that appellant was no longer competent would be relevant. The differences in appellant's actions and statements in his prior interviews and the June 1999 interviews would be relevant, and they would certainly be an area ripe for cross-examination. Mr. Lax certainly made his determination as to appellant's competency based upon his relationship and involvement in appellant's case over the two year period he worked with appellant, rather than solely on the two June 1999 interviews. This court determines that the trial court did not abuse its discretion with regard to this ruling.

As for witnesses Hea and Ingle, appellant asserts that a criminal defendant has a due process right to call witnesses on his own behalf. Washington v. Texas, 388 U.S. 14, 23 (1976). Appellant then asserts that the trial court's rulings with respect to these witnesses "impinged upon [his] right to present a defense to an unconstitutional degree" and cites Knight v. Dugger, 863 F.2d 705, 725-29 (11th Cir. 1988). Appellant further contends that the trial court erred when it invoked mere evidentiary privileges to deny, or at least diminish, his right to call witnesses to support his claim of competency. The issue of the appropriate burden in establishing competency is of manifest importance to the issue of whether the trial court erred in allowing appellant to assert his privileges.

Appellant contends that the trial court's rulings as to Ingle and Hea are incorrect because appellant was presumed to be incompetent at the hearing and, therefore, did not have the ability to assert or waive either the priest/parishoner privilege or the attorney/client privilege. The appellant relies upon the 1911 Tennessee Supreme Court case of Jordan v. State, 135 S.W. 327, 329 (Tenn. 1911), and the case of State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991), for the proposition that the State bears the burden of proving a defendant's competence to stand trial once the issue of competency is raised. It is the appellant's position that, once competency is raised, a criminal defendant is presumed incompetent until the State proves otherwise. The State, however, asserts that the burden is on the criminal defendant to establish his incompetency to stand trial by a preponderance of the evidence and relies on United States v. Shepard, 538 F.2d 107, 110 (6th Cir. 1976), and State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). The trial court asserted in its memorandum opinion on the motion for new trial that the law on the burden of proof is unclear. Appellant asserts that the supreme court cases of Jordan and Black place the burden of proof on the State by "approving" jury instructions that placed the burden on the State. Appellant submits that because the supreme court is the highest court in the state, the court of criminal appeals' decision in Oody "is of no consequence."

This Court determines that, based on Oody, the burden of proof at a competency hearing rests on the criminal defendant to establish incompetency to stand trial by a preponderance of the

evidence. Appellant's reliance on Black and Jordan is misplaced. Jordan did not hold simply that the burden was on the State to prove competency by a preponderance of the evidence as argued by appellant. Rather, Jordan adopted a shifting of the burden when it found that the following jury charge was "in all things correct." Jordan, 135 S.W. at 329.

> The law presumes that all persons are of sound mind until the contrary is made to appear. When, therefore, any person charged with a criminal offense punishable by death or imprisonment pleads insanity, as in this case, and presents evidence establishing or tending to establish the said plea, which evidence is sufficient to rebut and overturn the presumption of sanity, then it must be made to appear to your satisfaction from all the evidence that the defendant is of sufficient mental capacity to give sane advice to his counsel involving the charge in the indictment.

Id. at 328 (emphasis added). This charge does not support appellant's contention that once the issue of competency is raised, the burden is on the State the prove competency. Instead, Jordan requires a shifting of the burden whereby the defendant must first present evidence establishing incompetency, rebutting and overturning the presumption of competency. If the presumption of competency is sufficiently rebutted, then the burden shifts to the State.

Further, the mere reference of a trial court's statement in Black that the burden of proof was on the State to prove competency does not relegate that statement to the law in Tennessee. The holding in Black, relevant to the competency issue, was a determination that the criminal defendant in that case was competent to stand trial under the standards enunciated in the cases of Duskey, Mackey, and Benton, not who bore the burden at the competency hearing. Black, 815 S.W.2d at 173-75. Moreover, three months after the supreme court's decision in Black, the Tennessee Supreme Court declined to grant permission to appeal in Oody and has not since addressed this issue.

Because appellant is presumed competent at the hearing, appellant had the right to assert his privileges, which prevented the witnesses at issue from testifying. This Court concludes that there was no error in the trial court's rulings on this issue.

### XXIII. Testimony of Dr. Xavier Amador

Appellant contends that the trial court erred in forcing defense expert Dr. Xavier Amador to testify at the competency hearing without giving him sufficient time to: (1) review cassette tapes Dr. Bernet had recorded during his interview with appellant prior to the competency hearing and (2) review Dr. Turner-Graham's report. The proof at the competency hearing was presented out of order due to Dr. Amador's scheduling constraints. The defense presented Dr. Pamela Auble as its first expert. Next, the State presented the testimony of Dr. Bernet, during which cassette tapes of a two hour and fifteen minute interview with appellant were introduced. Dr. Cynthia Turner-Graham testified next. Following her testimony, the court asked defense counsel to call its next witness. Dr. Amador's flight, however, had been cancelled the previous night, and he had not yet arrived. When

Dr. Amador arrived, he was given Dr. Turner-Graham's report and the tapes from Dr. Bernet's interview for his review.

Defense counsel asked that Dr. Amador be given additional time to review the tapes and report upon his arrival. The trial court denied the request explaining that Dr. Amador had at least thirty minutes to review the report, and that he could review the tapes during the lunch break. Further, the court explained that defense counsel heard the tapes and could advise him concerning the same.

Dr. Amador never indicated that his testimony was compromised by insufficient time to review the report or the tapes. Appellant argues that, if Dr. Amador had been given additional time to review Dr. Bernet's taped interview, he would have been better equipped to challenge Dr. Bernet's conclusions. This court finds that the record does not support appellant's arguments on this issue. This issue is without merit.

## XXIV. Testimony of Dr. Turner-Graham

One day following the conclusion of the trial, Gary C. Tamkin, an assistant public defender with the Metropolitan Public Defender's Office executed an affidavit stating in pertinent part:

1. I am an Assistant Public Defender with the Metropolitan Public Defender's Office.
2. On Monday, September 6, 1999, in the early evening, Dr. Cynthia Turner-Graham, a friend of mine, visited my residence and mentioned that she was asked by the Court to conduct a competency evaluation of Paul Reid.
3. During the course of this conversation, she said that she believed that she had met one of the victims in the Paul Reid cases. She said that she thought one of the victims knew her son and had actually been to her house.

Based upon this affidavit, appellant requested a new competency hearing in his motion for new trial. The trial court denied the motion finding that the affidavit was not credible partially because the affiant spoke to the expert witness several days before trial but did not execute his affidavit until one day following the conclusion of the trial. The trial court found it "inconceivable" that an assistant public defender would receive that type of information prior to trial and fail to communicate it to his colleagues.

The trial court also placed great weight on the failure of appellant to present any testimony at the new trial hearing, given the importance of the competency issue. The court found that, even assuming that the allegations in the affidavit were true, it was giving them little weight. The court noted that the affidavit did not affirmatively establish that Dr. Turner-Graham knew one of the victims. Instead, "the affidavit establishes that Dr. Turner-Graham might have met a victim who might have known her son and might have visited her home." The court then noted that the victim referenced was one of the victims in one of appellant's Davidson County cases. The court concluded

that "[g]iven the circumstances, the Court finds that the defendant has offered no proof and alleged no facts which would cause the court to alter its opinion regarding the credibility of Dr. Turner-Graham."

Appellant argues on appeal that the trial court erred. He contends that the caseload of the Metropolitan Public Defender's Office is "staggering," and "each attorney simply does not have the time or mental wherewithal to keep up with the schedules of his colleagues in addition to his own." Appellant asserts, therefore, that it is reasonable that Tamkin did not relay this information to defense counsel in time for the competency hearing. Appellant further notes that Tamkin is an officer of the court and has an ethical obligation to be truthful in his dealings with any court.

This court finds no error in the trial court's ruling on this issue. Accordingly, this issue is without merit.

## XXV. Testimony of Elfreida Lane

During Elfeida Lane's redirect testimony, the prosecuting attorney asked her if she had ever been through the drive-thru window at Baskin-Robbins with her daughter and appellant. Ms. Lane replied, "We did not go through Baskin Robbins, sir." Counsel then attempted to ask another question, and Ms. Lane interrupted and said, "that was my daughter that said that not - - we did not go through Baskin Robbins. Not to my knowledge." Defense counsel then objected to the hearsay. The State responded that it had not intended to elicit hearsay testimony. The trial court sustained the objection and instructed the jury to disregard that portion of Ms. Lane's testimony and consider it for no purpose. Thereafter, the State asked Ms. Lane if she and a member of her family and appellant had gone through the drive-thru at Baskin-Robbins. After Lane responded that she could not remember doing so, counsel asked if it was possible that, after they dined at Logan's, they went to get ice cream. Ms. Lane stated that she could not remember doing so.

At no point during this exchange did defense counsel request a mistrial. Appellant now asserts that the court should have <u>sua</u> <u>sponte</u> granted a mistrial. A mistrial should be declared in a criminal trial only in the event of a "manifest necessity" that requires such action. <u>State v. Hall</u>, 976 S.W.2d 121, 147 (Tenn. 1998) "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." <u>State v. Williams</u>, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The determination of whether to grant a mistrial rests within the sound discretion of the trial court. <u>State v. Smith</u>, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. <u>Reid</u>, 91 S.W.3d at 279. Moreover, the burden of establishing the necessity for a mistrial lies with the party seeking it. <u>Williams</u>, 929 S.W.2d at 388.

Appellant's counsel did not move for a mistrial based upon the hearsay testimony by Ms. Lane. Moreover, the trial court gave a curative instruction, which the jury is presumed to have followed. <u>Hall</u>, 976 S.W.2d at 148. This issue is without merit.

### XXVI.  Testimony of Loretta Diorio and Stephen Diorio

During a break in the testimony of Stephen Diorio, he went into the hallway and sat with his mother, Loretta Diorio, who had already testified.  As they were sitting in the hallway, a news reporter was making a live broadcast concerning the trial.  Appellant's counsel immediately alerted the court and moved to strike the testimony of both Stephen and Loretta Diorio.  The court questioned Stephen Diorio outside of the presence of the jury about what he had heard.  Stephen admitted that he heard part of the news report and that the reporter stated that, after a long pause, "I pointed out the person."  He did not hear anything else the reporter said.  The court then ruled that there was no Tennessee Rule of Evidence 615 violation.  The court went on to state that, although witness Stephen Diorio could have been adversely affected and the Rule compromised, the same had not occurred.

On appeal, the appellant argues that the trial court erred.  Tennessee Rule of Evidence 615 provides in pertinent part: "At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing . . .   The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness."  Tenn. R. Evid. 615.  The sequestration rule is designed to prevent witnesses from hearing the testimony of other witnesses and subsequently adjusting their testimony.  State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992).  When a sequestration rule violation is raised on appeal, the court shall consider the seriousness of the violation and the prejudice, if any, suffered by the defendant.  Id. at 68-69.  In the case at bar, any violation was minor, appellant suffered no resulting prejudice.  This issue is without merit.

### XXVII.  Introduction of Undergarment of Victim Angela Holmes

During the trial, Tobaris Holmes identified the clothing his wife was wearing on the night of her murder.  The clothing was found at the crime scene and included Angela Holmes's bra.  The State moved for the admission of the articles of clothing into evidence without objection.  Appellant now argues that the court should have removed the bra from evidence.  Appellant argues that the bra had little or no relevancy and that any relevancy was outweighed by the prejudice it caused.

Appellant failed to object when the bra was admitted into evidence.  The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal.  Tenn. R. App. P. 36(a); see also State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992).  This issue is without merit.

### XXVIII.  Exclusion of TBI Memorandum

During the cross-examination of TBI agent Samera Zavero, appellant attempted to introduce into evidence a TBI memorandum, which stated that a person named James Jones could not be excluded as a possible donor of the DNA found on appellant's right shoe.  The trial court excluded the memorandum as irrelevant because there was no evidence that James Jones had anything to do

with the case.  Appellant argued that the memorandum was relevant because the State mentioned James Jones in opening statement.

During its opening statement, the State told the jury that the case had been a hard case for law enforcement and the proof might show that appellant was not the first suspect in this case.  Three men, Jones, Shelly, and Black, all of whom had a crack problem and were partying, taking guns, and selling them for crack, may have been the first suspects.  Later in the opening, the State discussed the expected DNA evidence found on appellant's shoes and commented "that's why [the DNA evidence of] Jones and Shelly and Black were given up."  The trial court found that the mention of James Jones during opening statement was insufficient to establish the relevance of the document without any other evidence that James Jones had an involvement in the case.

Appellant contends that, because the State injected the name of James Jones into the issue of the identity of the perpetrator of the crimes, the memorandum is relevant.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  Tenn. R. Evid. 403.  However, "[o]f critical importance here is the nature of opening statements.  They are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove.  Such statements do not amount to stipulations and certainly are not a substitute for the pleadings or for the evidence."  Harris v. Baptist Mem'l Hosp., 574 S.W.2d 730, 732 (Tenn. 1978).

After a review of the evidence, we conclude that the trial court did not err in excluding the TBI memorandum.  James Jones was never shown to have any involvement with the case.  As such, any reference to him in a TBI memorandum is irrelevant to the determination of the facts at issue.  Accordingly, this issue is without merit.

### XXIX.  Testimony of Jeffrey Potter

Appellant contends that the testimony of Jeffrey Potter should have been excluded because his conversation with appellant was too far removed in time from the Baskin-Robbins incident to provide meaningful insight into appellant's motive.  The testimony was about a conversation Mr. Potter had with appellant wherein the appellant told him robbery would be an easy way to make money.  The trial court held a jury-out hearing to determine when the comment was made in relation to the Baskin-Robbins murders.  Potter could not recall the date of the conversation but testified that the statement was made a few months before the Baskin-Robbins murders.   He also testified that the statement was made in late summer 1996.  Further, he could recall that the statement was made during appellant's second term of employment with Shoney's and that appellant made the statement shortly before he was terminated.  The court ruled that the statement was not too remote in time and allowed him to testify as to the statement.

Potter testified before the jury that appellant made the statement in January 1997, shortly before he was fired. Defense counsel questioned him on the discrepancy in his testimony, and he replied that he had gone home, thought about it, and tried to get everything right.

This court cannot find that the court erred in allowing Potter to testify as to the statement made by appellant. This issue is without merit.

### XXX.  Use of Styrofoam Heads by Dr. Harlan as Demonstrative Evidence

Appellant challenges the use of demonstrative evidence by the medical examiner as inappropriate. During Dr. Harlan's testimony, he used styrofoam heads to demonstrate, with a pen, the head wounds suffered by the victims. This court approved the use of this type of demonstrative evidence in State v. Robert E. Cole, No. 02C01-9207-CR-00165, 1993 WL 539185, at *3 (Tenn. Crim. App. at Jackson, Dec. 30, 1993). In Cole, this Court concluded that the evidence was "highly probative as to the issues to be decided by the jury. Under the circumstances, the trial court did not err in admitting the challenged evidence." Id. (citing State v. King, 718 S.W.2d 241 (Tenn. 1986); State v. Sexton, 725 S.W.2d 371 (Tenn. Crim. App. 1986)).

This court cannot find that the use of the styrofoam heads was inappropriate in this case as the appellant urges. The trial court did not err in its ruling that the use of the styrofoam heads would assist Dr. Harlan in demonstrating the location of the wounds. This issue is without merit.

### XXXI.  Failure to Allow Introduction of Police Report

At trial, the defense called Detective R.W. Knight to impeach the testimony of Jay Smith and LaVonda Zimmerman concerning statements or reports they made to the police during the investigation of this case. In particular, Detective Knight testified that Smith gave him a tag number of a red car that he believed was the same car he saw in Dunbar Cave State Park. Subsequent investigation revealed, however, that the car belonged to someone other than appellant. Additionally, Detective Knight testified that the police asked Zimmerman about cars pulling into the Baskin-Robbins parking lot, but Zimmerman stated she did not mention the red car pulling into the parking lot because the police did not ask her about any such cars.

At the conclusion of Detective Knight's testimony, the defense requested that the reports summarizing Detective Knight's interviews with Smith and Zimmerman be admitted into evidence. The State objected on the basis that appellant had elected to use a witness to impeach the testimony of the witness rather than use the reports of the statements under Tennessee Rule of Evidence 613. The trial court sustained the State's objection, finding that appellant could have confronted Smith and Zimmerman with the prior inconsistent statements under Tennessee Rule of Evidence 613 but chose not to do so, and he instead utilized the testimony of Detective Knight.

Appellant argues that Tennessee Rule of Evidence 613 does not limit the manner of impeaching a witness to either extrinsic evidence or a witness and that nothing in the rule indicates

that the methods listed are mutually exclusive. We agree. However, we note that Tennessee Rule of Evidence 613(b) provides, in pertinent part:

> [e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible <u>unless</u> the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Tenn. R. Evid. 613(b) (2002) (emphasis added).[8]

As a general matter, the admission or exclusion of evidence is a matter within the trial court's discretion, and a trial court's decision in this regard will be overturned only if the court abused its discretion. <u>State v. Baker</u>, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989). Additionally, while neither party has cited to any case law to support their respective positions, we note that <u>State v. Martin</u>, 964 S.W.2d 564 (Tenn. 1998), held that before extrinsic evidence of a statement is offered, the fact witness sought to be impeached must be asked about the inconsistency and be given a chance to explain or deny it. In <u>Martin</u>, the witness, the defendant's girlfriend, testified that the defendant was with her at their apartment at the time of the robbery at issue. <u>Id.</u> at 566. On cross-examination, the witness admitted speaking to an officer shortly after the robbery, and she said that she did not tell the officer that the defendant was with her when the robbery occurred. <u>Id.</u> On rebuttal, the State called the officer who testified that when told the date of the robbery, the witness said to the defendant, "I don't know where you were, I was in the motel." <u>Id.</u> Because the extrinsic evidence of the prior inconsistent statement was introduced without first asking the witness whether she had made the statement to the defendant or to anyone else, the supreme court held that the extrinsic evidence should not have been admitted, because "the admissibility of the extrinsic evidence is contingent upon whether the witness admits or denies having made the prior inconsistent statement." <u>Id.</u> at 567-68. In other words, "extrinsic evidence [of a prior inconsistent statement] remains inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement." <u>Id.</u> at 567.

Here, Zimmerman was questioned extensively on cross-examination regarding her statements to the police after her trip to Baskin-Robbins. She was even shown the statement she made to police in an attempt to refresh her memory. After examining the statement, Zimmerman denied telling the police that she saw a red car pulling into the parking lot that night because she insisted that no one asked her about a car. Therefore, Zimmerman, as required by Rule 613, had a chance to admit or deny making the statement prior to the introduction of the extrinsic evidence, namely Detective Knight's testimony. Smith was also questioned extensively about whether he made a phone call to police on May 1 in which he provided them with the make, model, and tag number of the car he

---

[8]Although having no bearing on the case herein, the Tennessee Supreme Court submitted a proposed amendment to Rule 613(b) on January 31, 2003, to add the words "and until" after the word "unless" in order to incorporate the holding in <u>State v. Martin</u>, 964 S.W.2d 564 (Tenn. 1998). The amendment was ratified and approved by 2003 House Resolution 22 and Senate Resolution 10 and became effective July 1, 2003.

believed he saw at Dunbar Cave State Park on the night of the murders. After reviewing a document which contained the contents of the telephone call, Smith did not deny making the statement. He stated, "It says I did. I did. I will say I did. . . [b]ut honest to God [I] do not remember making a phone call about that." Therefore, Smith, when given the opportunity to admit or deny the statement prior to the introduction of the extrinsic evidence, as required by Rule 613, could not remember making the telephone call. The testimony of Detective Knight was introduced after the testimony of both Smith and Zimmerman for the purposes of impeachment. He testified regarding the inconsistencies in their testimony as compared to the statements each made to the authorities. The trial court chose to exclude the introduction of the actual police report on the basis that Rule 613 only allowed introduction of one form of extrinsic evidence.

While the plain language of the rule does not limit the introduction of extrinsic evidence of prior inconsistent statements to one form, we determine that, in any event, the introduction of the report would have been cumulative to Detective Knight's testimony under Tennessee Rule of Evidence 403. See U.S. v. H.J.K. Theatre Corp., 236 F.2d 502, 508 (1956) (holding that where trial testimony of a witness as to a particular fact had been impeached by one passage in witness' prior testimony before a grand jury, it was within the trial court's discretion to prevent, as unduly time-consuming and unimportantly cumulative, an inspection of, and cross-examination on, other passages in previous testimony as to the same matters on the same occasion before the grand jury). Detective Knight had already testified as to the contents of the report; therefore, the report would not have offered any new evidence for the jury to consider. The trial court did not abuse its discretion in failing to admit the report. Accordingly, this issue is without merit.

## XXXII. Sufficiency of the evidence

Appellant challenges the sufficiency of the convicting evidence. Appellant contends the evidence is insufficient to prove the convictions of premeditated murder, felony murder, especially aggravated kidnapping, and especially aggravated robbery, relying primarily on the fact that the evidence was circumstantial. The State argues that the evidence is sufficient. We agree.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Harris, 839 S.W.2d at 75. Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or

reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). We may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. However, a conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." Reid, 91 S.W.3d at 277 (quoting Smith, 868 S.W.2d at 569). Questions about witness credibility were resolved by the jury. See Bland, 958 S.W.2d at 659.

The record reflects that, prior to this crime, the defendant discussed robbing fast food restaurants with co-workers as a way to obtain more money. Appellant had a large knife in the trunk of his car in late May or June 1997, with a blade of approximately eight to nine inches. The victims were murdered with a cutting instrument consistent with a knife that had a blade of eight to nine inches. Although appellant lived in Nashville, he was in Clarksville on the night of the murders. Appellant purchased gasoline at a Texaco station near the Baskin-Robbins shortly before the murders. He called Elfreida Lane the day following the murders and told her he was in Clarksville the night before and was going to stop by to see her, but he did not because it was too late. Appellant was seen in Dunbar Cave State Park prior to the murders, and a car matching the description of his was seen in the parking lot of the Dunbar Cave State Park shortly after the disappearance of the victims from Baskin-Robbins. The victims' bodies were found near the parking lot of the park. Appellant was fired from his employment at Shoney's in January 1997. Cash in the amount of $1,565.58 was taken from Baskin-Robbins. Despite being unemployed and having very little money in his checking account, appellant mailed a money order in the amount of $125 to Linda Patton less than three days after the murders to pay for one-half of her airfare to Nashville. Once Ms. Patton arrived in Nashville, appellant entertained her by paying for her hotel room for five days, meals, and sightseeing attractions. Ms. Patton testified that he used cash to pay for most of the expenses. Eleven fibers found on the victims' clothing were consistent with fibers from various locations in appellant's car. DNA evidence on the appellant's left brown Nike shoe was consistent with the DNA profile of Angela Holmes. Neither Angela Holmes nor Michelle Mace could be excluded as donors of the blood stains found on appellant's right, brown Nike shoe. Considering the proof in the record in the light most favorable to the State, we conclude that the proof points the finger of guilt unerringly at appellant and appellant alone. Therefore, the appellant's challenge to the sufficiency of the evidence is without merit.

## XXXIII.  Prosecutorial Misconduct in Guilt Phase

Appellant contends that the prosecutors committed numerous acts of prosecutorial misconduct during their arguments in the guilt phase.[9]  When reviewing allegations of prosecutorial misconduct, "[t]he general test to be applied is whether the improper conduct could have affected the verdict to the prejudice of the defendant."  Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); see also State v. Richardson, 995 S.W.2d 119, 127 (Tenn. Crim. App. 1998).  The factors relevant to the court's determination are:

1.  The conduct complained of viewed in light of the facts and circumstances of the case;
2.  The curative measures undertaken by the court and the prosecution;
3.  The intent of the prosecutor in making the improper arguments;
4.  The cumulative effect of the improper conduct and any other errors in the record; and
5.  The relative strength and weakness of the case.

Nesbit, 978 S.W.2d at 894.

### Reference to Danny Tackett's testimony

During opening statement, the prosecutor commented:

You are going to hear testimony from Danny Tackett and maybe another co-worker . . . We think Mr. Tackett is going to tell you that he worked with Mr. Reid at a Shoney's . . . and that there was talk when the two of them worked about raising money, not by donating money at the Plasma center or anything like that.  There was talk about raising money by conducting robberies.

Defense counsel objected, and the court conducted a sidebar conference.  The court reminded defense counsel that Tackett's testimony about the conversation would be admissible at trial, a finding he had previously made.  The court then advised the prosecutor to limit his remarks to anticipated evidence that he believed in good faith would be forthcoming, not otherwise.  At trial,

---

[9]Among other things, appellant challenges: (1) the State's reference to the DNA database as "big, huge" as misleading to the jury; (2) the implication by the State that appellant had committed other murders by referring to the murders in "this county" and "our county;" (3) the implication by the State that appellant failed to testify; (4) the State's reference to the donor of blood on the shoes of appellant as belonging to the victims; (5) the State's reference to latex gloves that were found at the crime scene and their connection with appellant; and (6) the State's "bank of justice analogy" in closing argument that indicated it was the jury's civic duty to find appellant guilty.  Appellant failed to make objections to these alleged instances of prosecutorial misconduct at trial.  Appellant's failure to object constitutes waiver of these issues on appeal.  State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999) (citing Tenn. R. App. P. 36(a)); State v. Green, 974 S.W.2d 186, 188 (Tenn. Crim. App. 1997); Little, 854 S.W.2d at 651 (holding that failure to object to prosecutor's alleged misconduct during closing argument waives later complaint).  Accordingly, these issues are without merit.

Tackett testified that when appellant asked him about how he could get money, he suggested committing robbery as a means of making money and mentioned a "fast food place, you know, middle of night, no witnesses." Tackett agreed that he made the suggestion to appellant.

Appellant argues that the prosecutor's comment during opening statement intimated that appellant, not Tackett, made the robbery statement about committing a robbery; therefore, the prosecutor committed misconduct. The prosecutor's comments regarding Danny Hackett's suspected testimony were not improper. Moreover, the comments could not have affected the verdict to the prejudice of appellant, because the jury heard Tackett testify he brought up the robbery suggestion. This issue is without merit.

### Writing of the word "match" on visual aid

During closing argument, the prosecutor used a visual aid in connection with his argument as to the fiber evidence in the case upon which the word "match" was written. The defense objected, arguing that the word "match" implied identity, whereas the testimony of the expert witness had been that the fibers found on the victims' clothing were "consistent" with fibers found in appellant's car. The trial court overruled the objection, stating, "The rules provide that the closing argument by the State is limited to the subject matter covered in the State's argument and the argument by the defendant. Also the law provides that counsel may comment on the evidence and reasonable inferences that may be drawn therefrom. Discussion about fibers was included in the State's opening argument. It was also covered by the defendant in his argument. So, the rules provide that subject matter is fair game." The trial court further explained, "The specific use of the word match . . . if he uses it, that's his take on the evidence. He can comment on what he thinks the evidence is. . . The jury heard the evidence, and its [sic] up to them to sort out whether his use of the word match is appropriate or not."

The closing argument is a valuable privilege for both the State and the defense and counsel is afforded wide latitude in presenting final argument to the jury. See State v. Cribbs, 967 S.W.2d 773, 783 (Tenn. 1989); State v. Cone, 665 S.W.2d 87, 94 (Tenn. 1984). However, when a prosecutor's argument "veers beyond the wide latitude afforded, the test for determining if reversal is required is whether the impropriety 'affected the verdict to the prejudice of the defendant.'" Cribbs, 967 S.W.2d at 783. Appellant argues that the use of the word "match" characterized the proof as much stronger than it actually was, which thereby misled the jury. The prosecutor did not exceed the latitude given him in writing the word match on the visual aid. Moreover, the word "match" on the visual aid did not affect the verdict to the prejudice of appellant. The jury heard the experts' testimony that the fibers on the victims' clothes were "consistent." The experts were thoroughly cross-examined on this point. Additionally, the jury was instructed that arguments of counsel are not to be considered evidence. The jury is presumed to follow instructions. State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994). This issue is without merit.

**Appeal to jury's passion**

In closing argument, the prosecutor placed pictures of each victim on a projector and left them there for seven minutes. At some point, the prosecutor threw dollar bills on the projector used to display the images of the victims. Appellant asserts that, by these acts, the prosecutor intended to inflame the passion of the jury, which is prohibited. See Watkins v. State, 203 S.W.2d 344, 345-46 (Tenn. 1918). The State argues that the prosecutor was simply demonstrating to the jury that it was money that motivated appellant to rob, kidnap, and murder the victims, whose pictures were being projected, and to eliminate the victims as witnesses. These actions, although dramatic, were not "conduct so improper that it affected the verdict." Harrington, 385 S.W.2d at 759. This issue is without merit.

**Biblical reference**

In closing argument, the prosecutor stated, "No matter how hard you try murder will out. If necessary the stones themselves will cry out. The shoes themselves will cry out as they did in this case. They will show the blood. Blood will out, and it did in this case. He couldn't get rid of every speck of blood." Appellant contends that this argument was based on a passage from the book of Habbukuk in the Bible. Habbukuk 2: 9-11 reads as follows:

> 9. Woe to him who gets evil for his house, to set his nest on high, to be safe from the reach of harm!
> 10. You have devised shame to your house by cutting off any peoples; you have forfeited your life.
> 11. For the stone will cry out from the wall, and the beam from the woodwork respond.

Habbukuk 2:9-11 (Revised Standard Edition). Appellant did not make a contemporaneous objection to the prosecutor's comments. Therefore, this issue is waived. See Thornton, 10 S.W.3d at 234 (citing Tenn. R. App. P. 36(a)); Green, 974 S.W.2d at 188; Little, 854 S.W.2d at 651.

Although appellant did not make a contemporaneous objection to the Biblical reference, he moved for a mistrial after the completion of the State's closing argument and after the jury had left the courtroom. Appellant argued that based on the totality of the prosecutor's argument, specifically including the Biblical reference, the pictures of the victims on the projector for seven minutes, the latex gloves comments, and the bank of justice analogy, the argument appealed to the passion and sympathy of the jury. A mistrial should be declared in a criminal trial only in the event of a "manifest necessity" that requires such action. Hall, 976 S.W.2d at 147. "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Williams, 929 S.W.2d at 388. The determination of whether to grant a mistrial rests within the sound discretion of the trial court. Smith, 871 S.W.2d at 672. The reviewing court should not overturn that decision absent an abuse of discretion. Reid, 91 S.W.3d

at 279.   In this case, the trial judge found there was no manifest necessity requiring a mistrial.  We agree.

On appeal, appellant correctly notes that any references to the Bible during closing argument are prohibited.  See Cribbs, 967 S.W.2d at 783.  The supreme court has held a Biblical reference to be harmless error.  See id. at 783 (holding prosecutor's quotation to the Bible, "Whatever a man sows, so shall be reaped" as harmless).  In Cribbs, the prosecutor acknowledged in his closing that it made him uncomfortable to mention Biblical references, but he then quoted the reap what you sow passage.  Id.  He then explained to the jury that he did not want anyone to be offended by the Biblical reference, but it was a very important part of our law.  Id.  Notwithstanding, the court held that the prosecutor's comments were harmless because they did not affect the verdict of the jury.

In the order denying appellant's motion for new trial, the trial court found that the reference was of a religious nature and constituted error, but found that it was harmless.  The court noted that the "passage is one of relative obscurity.  Therefore, the court finds it unlikely that the jurors were actually aware of the remainder of the passage and/or its meaning.  This is particularly true given the context of the reference."  Based on our review of the record, we find that the prosecutor's Biblical reference did not affect the verdict to the prejudice of appellant and that the trial court did not abuse its discretion.  Therefore, this issue is without merit.

## XXXIV.  Life Photographs of Victims

Appellant challenges the introduction of photographs of the victims before they were murdered during the victim impact testimony.  Appellant asserts that the photographs served only to inflame the jurors and appeal to their emotions.  The State counters that the photographs were probative of the issue of  the impact of the death on the victims' family members and to show those unique characteristics which provide a brief glimpse into the life of the victims.  The supreme court has held:

> [g]enerally, victim impact evidence should be limited to information to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

Nesbit, 978 S.W.2d at 887.  In this case, the photographs were introduced to provide a brief glimpse into the lives of the victims, as allowed by Nesbit.  Accordingly, the court did not err in allowing the introduction of these photographs.

## XXXV. Photographs of Victims at Crime Scene

Appellant asserts that the trial court erroneously admitted one crime scene photograph of each victim during the penalty phase because they were cumulative to other evidence and their probative value was outweighed by their prejudicial effect. The State sought to admit the photographs as relevant to prove the "heinous, atrocious, or cruel aggravator" under Tennessee Code Annotated section 39-13-204(i)(5). The trial court admitted the photographs for that purpose.

The supreme court has addressed postmortem photographs introduced not only to illustrate testimony but also to show the brutality of the attack and extent of force used against the victim, from which the jury could infer the "heinous, atrocious, or cruel aggravator" as follows:

> With regard to the postmortem photograph, our supreme court has held that photographs may be introduced in order to illustrate testimony. Stephenson, 878 S.W.2d at 542. Moreover, the decision to admit or limit cumulative evidence rests within the sound discretion of the trial court. State v. Brown, 836 S.W.2d 530, 553 (Tenn.1992) (photographs of victim's body admissible despite oral testimony "graphically" describing victim's injuries). See also State v. Van Tran, 864 S.W.2d 465, 477 (Tenn.1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994) (color photographs of deceased victims at scene of crime were admissible despite introduction of extensive color videotape showing victims' bodies as they were found). In any event, a relevant photograph is not rendered inadmissible merely because it is cumulative. Bigbee, 885 S.W.2d at 807; Van Tran, 864 S.W.2d at 477. See Smith, 893 S.W.2d at 924 (photographs of victim appropriately admitted for establishing "heinous, atrocious, cruel" aggravating factor).

State v. Keen, 31 S.W.3d 196, 212-13 (Tenn. 2000). The photographs in this case were relevant to show the brutality of the attack and the extent of force used against each victim in cutting their throats all the way to the spinal cord. The trial court found that "the truly devastating nature of the wounds inflicted upon these victims cannot be conveyed in words or demonstrations." The photographs are not particularly gruesome; they do not depict large amounts of blood or close-up views of the wounds. Instead, the photographs are nearly full body photographs of each victim. The photographs are admissible to prove the "heinous, atrocious, or cruel aggravator", and the trial court did not abuse its discretion. This issue is without merit.

## XXXVI. Victim Impact Testimony of Tobaris Holmes

Appellant next contends that the trial court should have excluded the victim impact testimony of Tobaris Holmes during the penalty phase, wherein Mr. Holmes testified that his daughter Ryane "kisses Angela's picture and not Angela." This testimony was given in response to the prosecutor's question, "Mr. Holmes, how has Angela's murder affected your family?" Appellant did not object to Mr. Holmes's testimony; therefore, this issue is waived. See Thornton, 10 S.W.3d at 234 (citing

Tenn. R. App. P. 36(a)); <u>Green</u>, 974 S.W.2d at 188; <u>Little</u>, 854 S.W.2d at 651. Further, we find that this statement was proper victim impact testimony under <u>Nesbit</u>, 978 S.W.2d at 879. Accordingly, this issue is without merit.

### XXXVII. Testimony of Patricia Allen

Patricia Allen testified at the penalty phase as a speech language pathologist. She testified that she evaluates people with brain injuries to determine if they have been affected by the brain injury. She explained that "language is a code that reflects how someone is thinking." She then testified that, in evaluating a patient, she would look at their "reading and writing and the words they put together in sentences, we would also look at their thinking skills; things such as their ability to attend, to remember, to solve problems and to reason. Things like that." She further explained that a speech language pathologist was more involved in treatment and helping people with brain injuries to function, while a neuropsychologist would be more involved in the evaluation of how the brain is working and the behavior of the individual.

Later in defense counsel's direct examination of Ms. Allen, counsel asked how appellant's brain injury would have impacted his ability to conform to the rules established in the home. The State objected, arguing that such was outside her area of expertise. The court overruled the objection, and the witness responded. Next, after Ms. Allen confirmed that people with brain injuries have difficulty with rules, defense counsel asked: "How so?" Again, the State objected to the questioning as being outside Ms. Allen's area of expertise. This time the court sustained the objection.

It is the longstanding principle that the "propriety, scope, manner and control of examination of witnesses is within the trial court's discretion." <u>Harris</u>, 839 S.W.2d at 72. Ms. Allen testified that she, as a speech language pathologist, was more involved in treatment and helping people with brain injuries to function, while a neuropsychologist was more involved in the evaluation of how the brain is working and the behavior of the individual. Accordingly, the trial court did not err in precluding Ms. Allen from testifying as to how a person with a brain injury would have difficulty with rules. Moreover, as the trial court found, any such error in precluding the testimony was harmless. Appellant did not make an offer of proof. Therefore, he failed to demonstrate how he was prejudiced by the trial court's ruling. <u>See</u> State v. Galmore, 994 S.W.2d 120, 125 (Tenn. 1999) (although an offer of proof is unnecessary to preserve this issue, it may be the only way to demonstrate prejudice). Furthermore, Ms. Allen and the other defense experts testified at length as to appellant's physical and mental abnormalities and the effects of the same. Therefore, any error in sustaining the State's objection was harmless. This issue is without merit.

### XXXVIII, XXXIX and XL. Jury Charge of Mitigating Factors

Appellant contends that the trial court erred in charging the jury as to mitigating factors in three respects. First, he contends that the trial court erred in refusing to charge the jury on the statutory mitigator set forth in Tennessee Code Annotated section 39-123-204(j)(6), which provides

that "the defendant acted under extreme duress or under the substantial domination of another person." Appellant contends that his delusions caused him to believe he was acting under the control of government agents and, as a result, the "substantial domination" mitigator should have been charged. There is no authoritative support for appellant's contention. Moreover, appellant's mental illnesses were addressed in the statutory and non-statutory mitigators charged to the jury.

Next, appellant contends that the trial court erred by failing to charge the non-statutory mitigators in the same affirmative manner as the statutory mitigators. Basically, appellant attacks the non-statutory mitigators because they were not in the same "sentence structure" as the statutory mitigators. The charge the trial court gave complies with the non-statutory instructions approved by the Supreme Court in Odom, 928 S.W.2d at 31-32, and State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). This issue is without merit.

Finally, appellant contends that the trial court should have charged the "catch-all" mitigator set forth in Tennessee Code Annotated section 39-13-204(j)(9). Appellant did not, however, raise this issue at trial or in his motion for new trial. Failure to make a contemporaneous objection constitutes a waiver of the issue. See Thornton, 10 S.W.3d at 234 (citing Tenn. R. App. P. 36(a)); Green, 974 S.W.2d at 188; Little, 854 S.W.2d at 651. Moreover, failure to raise issues concerning jury instructions in a motion for new trial constitutes a waiver of such issues for purposes of appeal. Tenn. R. App. P. (3)(e); Tenn. R. App. P. 36(a).

Notwithstanding appellant's failure to object or raise the issue in a motion for new trial, he contends that the trial court's failure to charge the catch-all mitigator constitutes plain error and should be reviewed by this court. See Tenn. R. Crim. P. 52(b); State v. Ogle, 666 S.W.2d 58 (Tenn. 1984). Plain error exists where the error affects a substantial right of the defendant and strikes at the very fairness or integrity of the trial. Tenn. R. Crim. P. 52(b); State v. Wooten, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). The failure to charge the catch-all statutory mitigator does not strike at the very fairness or integrity of the trial and, therefore, does not constitute plain error. This issue is without merit.

### XLI. Trial Court Comments on State's Proof During Penalty Phase

At the conclusion of the court's explanation to the jury of the sentencing process, the court stated:

> But I say this only because I want you to develop your mind now with a view to looking to the State to offer evidence regarding the aggravating circumstances they contend apply, remembering that you must be convinced beyond a reasonable doubt and also applying the guidelines as I give you in my instructions that tell you how to go about considering those aggravating circumstances and whether or not they outweigh beyond a reasonable doubt the mitigation evidence, if you find such exists, that has been raised during the course of the trial.

Appellant argues that this statement by the court encouraged, at least implicitly, the jury to concentrate on the State's proof as opposed to that raised by appellant. Appellant has failed to allege how this statement prejudiced him. This issue is without merit.

## XLII.  Prosecutorial Misconduct During Penalty Phase

Appellant has alleged that the prosecutor committed several acts of prosecutorial misconduct during the final argument of the sentencing phase.[10] As set forth supra, the test to be applied when reviewing allegations of prosecutorial misconduct is whether the improper conduct could have affected the verdict to the prejudice of the defendant. Harrington, 385 S.W.2d at 759; see also Richardson, 995 S.W.2d at 127. The factors relevant to the court's determination are:

1. The conduct complained of viewed in light of the facts and circumstances of the case;
2. The curative measures undertaken by the court and the prosecution;
3. The intent of the prosecutor in making the improper arguments;
4. The cumulative effect of the improper conduct and any other errors in the record; and
5. The relative strength and weakness of the case.

Nesbit, 978 S.W.2d at 894.

### References to the defendant murdering four people in cold blood

Appellant asserts that the prosecutor, in referencing prior crimes committed by appellant, committed prosecutorial misconduct by "repeatedly assert[ing] that Defendant had murdered four people in 'cold blood.'" As support for this argument, appellant points to seven passages of the State's closing argument. In each of the seven passages, the prosecutor referenced the fact that appellant had killed four people, but in only two of those passages did the prosecutor assert that the murders had been committed in "cold blood." Appellant asserts that the term "cold blood" refers to premeditation. He argues that the evidence only showed that appellant had been convicted of first-degree murder in April 1999 rather than premeditated murder. Further, appellant contends that these statements shifted the focus of the trial to the previous crimes for which he had already been tried and convicted, which is prohibited. See Bigbee, 885 S.W.2d at 809-12.

---

[10]Among other things, appellant challenges: (1) the State's reference to Angela Holmes's thoughts as she lay dying; (2) the State's action of throwing dollar bills on the overhead projector which displayed the pictures of the victim during closing argument as appealing to the passion of the jury; and (3) the State's placement of the victim's photographs on the overhead projector. Again, appellant failed to object to these actions and statements during the prosecutor's closing. Therefore, they are waived. See Thornton, 10 S.W.3d at 234 (citing Tenn. R. App. P. 36(a)); Green, 974 S.W.2d at 188; Little, 854 S.W.2d at 651.

After the seventh reference to the four murders that appellant had committed, defense counsel objected. The trial court sustained the objection and gave the following curative instruction at the conclusion of the sentencing hearing:

Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements or arguments were made that you believe are not supported by the evidence, you should disregard them.

In its closing argument, the State may have implied that the jury should impose death because the defendant has been convicted of killing four people. The defendant has been tried, convicted and sentenced for his prior convictions. You are to consider those convictions only for the purpose of determining whether the State has proven beyond a reasonable doubt the existence of an aggravating circumstance, and for no other purpose.

A jury is presumed to follow the instructions of the trial court. State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Having considered the factors set forth in Nesbit, and the test set forth in Harrington, we conclude that the prosecutor's comments did not affect the verdict to the prejudice of the appellant.

## XLIII. Heinous, Atrocious and Cruel Aggravating Factor

The jury found that the murders of Angela Holmes and Michelle Mace were "especially heinous, atrocious, or cruel in that [they] involved torture or serious physical abuse beyond that necessary to produce death," pursuant to Tennessee Code Annotated section 39-13-204(i)(5). Appellant contends that the evidence is legally insufficient to establish this aggravator beyond a reasonable doubt. We disagree.

The facts of this case support the jury's finding that Angela Holmes's and Michelle Mace's murders were "especially heinous, atrocious, or cruel." These two young women were kidnapped from their place of employment at night; driven to a dark, wooded park; and savagely murdered. The victims were murdered with their hands bound, stabbed numerous times, and left in the dark to bleed to death. Their murders were so brutal that the deep lacerations to their throats cut into their backbones. Angela Holmes had other stab wounds, including non-penetrating stab wounds to the head. Ms. Holmes's neck wound was a deep wound that went "all the way to the backbone," transected the left common carotid artery and the jugular vein, injured the spinal column, and cut into the backbone in two areas. Michelle Mace's neck wound was so barbarous that the cut penetrated her backbone one quarter of an inch deep, resulted in five cuts to her vertebral column, and occurred as the result of a "sawing" motion. She sustained a total of fourteen stab wounds. Both victims were left to bleed to death following their attacks. The proof showed that they both would have remained alive for five to fifteen minutes following the fatal stab wounds and would have been conscious eighty percent of that time.

Based on the evidence, we find that the jury did not err in finding that the murders of Angela Holmes and Michelle Mace were "especially heinous, atrocious, or cruel" beyond a reasonable doubt.

## XLIV.  Sufficiency of Evidence to Support Jury's Finding that Aggravating Circumstances Outweighed Mitigating Factors Beyond a Reasonable Doubt

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1)(C), this court must determine whether the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.  The proper standard for making this determination is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.  See e.g., State v. Henderson, 24 S.W.3d 307, 313 (Tenn. 2000).

The jury found three aggravating circumstances following the sentencing hearing: (1) appellant had previously been convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person, Tenn. Code Ann. § 39-13-204(i)(2); (2) murders were committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of defendant or another, Tenn. Code Ann. § 39-13-204(i)(6); and (3) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, Tenn. Code Ann. § 39-13-204(i)(5).  As mitigation, appellant presented testimony related to his unstable childhood, several documented brain injuries, and the mental disorders of schizophrenia and anosognosia.  Additionally, appellant's experts testified that his brain injury affected his behavior.  As rebuttal, the State presented proof at the sentencing hearing that there was no link between appellant's brain injury and his criminal actions.  Moreover, the State presented proof that appellant had malingered in order to escape responsibility for his crimes.

We have carefully reviewed the record and conclude that despite the substantial mitigation proof presented by appellant, the evidence fully supports the finding of the jury that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.

## XLV.  Proportionality Review

Finally, appellant contends that the sentence of death in his case is disproportionate to the sentences imposed in similar cases.  In reviewing a defendant's sentence of death for first degree murder, "the reviewing court shall determine whether . . . the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant."  Tenn. Code Ann. § 39-13-206.

The supreme court has explained comparative proportionality review as follows:

In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. State v. Hall, 958 S.W.2d 679 (Tenn. 1997). A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." Id. citing State v. Ramsey, 864 S.W.2d 320, 328 (Mo. 1993). A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. State v. Bland, 958 S.W.2d 651 (Tenn. 1997) (citing State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986)). Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Bland, 958 S.W.2d at 665. Our duty "is to assure that no aberrant death sentence is affirmed." Id. (citing State v. Webb, 238 Conn. 389, 680 A.2d 147, 203 (Conn. 1996)).

Our proportionality review is neither a rigid nor an objective test. Hall, 958 S.W.2d at 699. There is no "mathematical formula or scientific grid," and we are not bound to consider only cases in which the same aggravating circumstances were found applicable by a jury. Id.; State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994). This Court considers many variables when choosing and comparing cases. Bland, 958 S.W.2d at 667. Among these variables are: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Id.; Hall, 958 S.W.2d at 699. Factors considered when comparing characteristics of defendants include: (1) the defendants' prior criminal record or prior criminal activity; (2) the defendants age, race, and gender; (3) the defendants' mental, emotional or physical condition; (4) the defendants' involvement or role in the murder; (5) the defendants' cooperation with authorities; (6) the defendants' remorse; (7) the defendants' knowledge of helplessness of victim(s); and (8) the defendants' capacity for rehabilitation. Id.

Hall, 976 S.W.2d at 135.

We have compared the circumstances of the present case with the circumstances of similar cases and conclude that the sentence of death in this case is proportionate to the sentences imposed in similar cases. See e.g., State v. West, 767 S.W.2d 387 (Tenn. 1998) (imposing the death penalty where defendant separated mother and daughter, restrained the victims, and stabbed one victim seventeen times and the other victim numerous times, upon finding of aggravating circumstances (i)(5) and (i)(7)); State v. Bush, 942 S.W2d 489 (Tenn. 1997) (imposing the death penalty where the

defendant murdered a 79 year-old widow upon finding aggravating circumstance (i)(5), despite substantial mitigation proof); State v. Harris, 839 S.W.2d 54 (Tenn. 1992) (imposing death penalty for murders of two victims, where victims had been both shot and stabbed, but fatal wound as to one victim was a deep cut to the throat that cut the trachea and major blood vessels and chipped the spinal column); State v. Payne, 791 S.W.2d 10 (Tenn. 1990) (imposing death penalty for stabbing two victims, where one victim was stabbed forty-one times and the second was stabbed nine times upon finding aggravating circumstances (i)(3) and (i)(5)); State v. Jones, 789 S.W.2d 545 (Tenn. 1990) (imposing death penalty where a thirty-eight-year-old murdered the victim who was stabbed six times after being bound, gagged and blindfolded, upon finding of (i)(2), (i)(5) and (i)(6) aggravating circumstances); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989) (imposing death penalty where female victim was taken to a remote location and stabbed repeatedly, upon finding aggravating circumstances (i)(5), (i)(6), and (i)(7)); and the companion cases of State v. Dicks, 615 S.W.2d 126 (Tenn. 1981), and State v. Strouth, 620 S.W.2d 467 (Tenn. 1981) (imposing death penalty where co-defendants robbed a store and slit the throat of elderly man who bled to death, upon finding aggravating circumstances (i)(5) and (i)(7)). After reviewing the above cited cases, as well as cases not specifically cited, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with Tenn. Code Ann. § 39-13-206(c), we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the sentence is not disproportionate. We have also reviewed all issues raised by appellant and conclude there is no reversible error. As a result, the judgments of the trial court and the sentence of death imposed by the jury are affirmed.

_____
JERRY L. SMITH, JUDGE